CNC SERVICE CENTER, INC., a Wisconsin corporation, Plaintiff,

v.

CNC SERVICE CENTER, INC., an Illinois corporation, et al., Defendants.

Ben L. EVENSON, etc., Defendant–Counterplaintiff and Third–Party Plaintiff,

v.

CNC SERVICE CENTER, INC., a Wisconsin Corporation, Plaintiff–Counterdefendant,

and

Jacques Hopkins, et al., Third–Party Defendants.

No. 88 C 6941.

United States District Court, N.D. Illinois, E.D.

Jan. 3, 1991.

See also 731 F.Supp. 293.

Merle L. Royce, Chicago, Ill., for plaintiff.

Michael A. Cotteleer, Wheaton, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This Court has conducted a bench trial dealing with the claims, counterclaims and

crossclaims in this action, and the parties have submitted their proposals for findings of fact and conclusions of law. This Court has further looked into all matters necessary for resolution of the claims that were not appropriately dealt with in the parties' submissions.

In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any the Conclusions as stated reflect factual findings, they shall be deemed Findings.

### FINDINGS OF FACT

1. These are the parties to this action:

(a) Plaintiff and Counterdefendant CNC Service Center, Inc. ("CNC–Wisconsin") is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.

(b) Defendant and Counterplaintiff Ben Evenson ("Evenson") was the sole shareholder at the time of the December 8, 1987 dissolution of CNC Service Center, Inc., an Illinois corporation ("CNC–Illinois"). Evenson is the successor in interest to CNC–Illinois.

(c) Third–Party Defendant Precision Machine Alignment, Inc. ("PMA") is a Wisconsin corporation originally incorporated as CH, Inc. with its principal place of business in Milwaukee, Wisconsin.

(d) Third–Party Defendant Jacques Hopkins ("Hopkins") was at all times relevant to this litigation President of CNC–Wisconsin and PMA and a shareholder and director of both corporations.

(e) Third–Party Defendant James Cote ("Cote") was at all times relevant to this litigation a shareholder and director of CNC–Wisconsin and PMA.

(f) Third–Party Defendant Mergers, Inc. ("Mergers") is an Illinois corporation with its principal place of business in this state.

2. Hopkins is a graduate accountant who holds certification as a "chartered accountant," the British equivalent of a certified public accountant. Hopkins has extensive financial management experience and expertise and also has extensive experience and expertise both as a business broker and in the area of due diligence investigation, which he has performed in connection with his own business acquisitions and in connection with the transactions of numerous brokerage clients. Cote is a graduate accountant with extensive national and international financial and banking experience, together with substantial experience in developing and marketing real estate securities programs.

3. During January 1987 [1] Cote met with Hopkins in Lake Forest, Illinois and laid out his objective to purchase and run a company, telling Hopkins he had $150,000 to invest. Because Cote had known Hopkins since 1981 and knew that he was a business broker, Cote asked Hopkins for assistance with his objective. Hopkins responded that he would look out for business opportunities for Cote. When fees for that service were discussed, Hopkins told Cote that his fees would be paid by the seller. Also in January 1987, on or about the date of Hopkins' meeting with Cote, Hopkins formed Mergers as a business brokerage firm.

4. It was Cote's understanding with Hopkins that so long as they were working together Hopkins would have an interest in whatever Cote did. Before their association Cote had never been involved in the management or ownership of his own business (though he had some prior experience in management), nor had Hopkins (though he had previously owned and managed two other business brokerage firms).

5. Less than a month after the meeting referred to in Finding 3, Hopkins through Mergers located a potential acquisition for Cote and himself. That led to the prepara-

---

**1.** Because the relevant negotiations and transactions and most (though not all) of the other relevant occurrences took place during 1987, the year 1987 is to be understood whenever these Findings hereafter omit a year designation for a particular date.

tion and presentation of a letter of intent calling for a highly leveraged transaction, without provision for any personal liability on the part of the purchasers. Although the letter of intent was signed by Cote and although Hopkins was there described as acting as a broker for a commission to be paid by the seller, pursuant to the existing agreement between Cote and Hopkins the latter was also to be an owner of the business in the event it was purchased.

6. In February 1987 Hopkins caused Mergers to send out a mailing to several businesses, including CNC–Illinois, in the capacity of a business broker seeking prospective sellers.[2] Shortly thereafter (about March 1987) Hopkins first made contact with Joseph Ettlie ("Ettlie"[3]) of Precision Machine Alignment, Inc. ("PMA–E"[4]) by means of an ad placed in the Wall Street Journal.

7. On March 25 Hopkins as President of Mergers gave assurances to Cote that if the latter signed a letter of intent for the acquisition of PMA–E even though the primary purpose was not Cote's sole personal acquisition of that company, Cote would have the absolute right to assign the letter of intent to Mergers "after it becomes a binding agreement by signature of the Seller." Then on April 8 Hopkins submitted a letter of intent to PMA–E and Precision Machine Service, Inc. ("PMS") in which Hopkins represented himself to be the purchaser and Mergers to be the broker for an acquisition at a proposed purchase price of $977,000. That letter of intent provided:

(a) for a highly leveraged acquisition by Hopkins without personal guaranties;

(b) for a brokers fee to be paid in part to Mergers in the amount of $109,240; and

(c) that if the due diligence review by Hopkins were to disclose that the purchase price should be reduced below $950,000 under the terms set out in the letter of intent, Ettlies (in lieu of accepting the lower purchase price) could rescind the proposed transaction upon payment of $15,000 to Hopkins.

In fact the contingency described in Finding 7(c) occurred, at which point Ettlies elected to rescind and Hopkins received the $15,000.

8. On April 13 Hopkins wrote to CNC–Illinois to reassert his interest in representing CNC–Illinois in the sale of its business and to advise CNC–Illinois that "we have a client currently completing the acquisition of two companies in your industry." That "client" was Cote, and the "two companies" were PMA–E and PMS.

9. On April 30, after Ettlies' rescission referred to at the end of Finding 7, Hopkins succeeded in obtaining Ettlies' agreement to a consultancy contract with Mergers, which provided that:

(a) Hopkins would work to re-establish a selling price of $977,000 for PMA–E and PMS within four to six months.

(b) Mergers would receive a commission on any sale of the businesses within six months on an exclusive basis.

(c) Hopkins, as buyer under the original April 8 letter of intent, would have a right of first refusal to match any acceptable offer for the business made by any third party.

10. During the month of May Hopkins was given access to all financial records (except work-in-process reports) of PMA–E and PMS for the purpose of fulfilling the consultancy agreement referred to in Find-

**2.** This and later findings contain references to further activities on Hopkins' part. Although much of that activity was undertaken in the name or on behalf of Mergers, that would not affect Hopkins' liability under the circumstances of this case. Hence these Findings will eschew such awkward locations as "Hopkins for Mergers" or the like in favor of simply saying "Hopkins."

**3.** Ettlie and his wife Catherine, co-owners of "PMA–E" and its related company "PMS" (see

Finding 7), are referred to collectively as "Ettlies."

**4.** Ettlies' corporation will be referred to by adding an "E" to its initials to distinguish it from the corporation of the same name that Hopkins and Cote later formed to carry out their acquisition, and to which they then gave the identical corporate name as that of Ettlies' corporate seller. That Hopkins–Cote corporation (see Finding 23) is the third-party defendant in this litigation referred to as "PMA" (see Finding 1(c)).

ing 9. Hopkins was paid over $12,000 for that consultancy work. Hopkins' findings resulting from that work are contained in the Business Plan drafted by Hopkins and dated in July 1987 (see Finding 13).

11. In May 1987 Hopkins established personal contact with Evenson for the purpose of discussing his representation of CNC–Illinois as its business broker. In June 1987 Hopkins informed Ettlies of his intention to include Cote in the purchase of PMA–E and PMS. During that same time frame, approximately four or five weeks after the beginning contact with PMA–E, Hopkins brought the possible purchase of CNC–Illinois to Cote's attention.

12. On June 16 Hopkins made his first visit to the CNC–Illinois offices at Elmhurst, Illinois. At that time he asked for copies of the tax returns of CNC–Illinois, which were promised to be provided and were then mailed to him. No financial information that Hopkins requested was refused to him either during that visit or during any later visit or meeting by Hopkins as to the CNC–Illinois acquisition. During that visit Hopkins learned of CNC–Illinois' negotiations with Machinery Systems International, Ltd. ("MSI") and offered to assist CNC–Illinois in those negotiations. Hopkins told Evenson that he was employed by Mergers and was in the process of consulting with PMA–E to make PMA–E salable. Hopkins also advised Evenson that he was acting as broker for the PMA–E acquisition, but he did not disclose who the purchasers of PMA–E might be.

13. About July 17 Hopkins prepared and submitted to the State Bank of Hales Corners, Wisconsin a "Business Plan" for the acquisition of PMA–E and PMS. Under the headings "Business Development" and "Acquisitions," the Business Plan stated that "consideration is currently being given to the acquisition of a CNC company out of Chicago, Illinois."

14. At about the same time (specifically on July 17), having received the requested CNC–Illinois tax returns, Hopkins again met with Evenson at CNC–Illincis. During that meeting Hopkins (in his role as CNC–Illinois' broker) was once again permitted full and complete access to whatever he might request as to CNC–Illinois' financial records and other information about the corporation. Like the June 16 meeting, the July 17 meeting took more than two hours.

15. During the July 17 meeting Hopkins told Evenson that he had a "problem" with Evenson's tax return information as to inventory valuation. Evenson then placed Hopkins in touch with CNC–Illinois' accountant by telephone. Hopkins was satisfied with the information that he obtained from the accountant, and although he was never at any time prohibited by Evenson from communicating with the accountant again, Hopkins never again sought to speak with the accountant about CNC–Illinois' financial matters.

16. All the representations that were made at the July 17 meeting as to CNC–Illinois' "fit" with PMA–E and as to the suitability of the CNC–Illinois acquisition for that purpose were made by Hopkins and not by Evenson (who had no prior knowledge of PMA–E). Hopkins also told Evenson at the meeting that Cote would be the purchaser from CNC–Illinois. Hopkins and Evenson also discussed CNC–Illinois' bank loans and lines of credit with the Bank of Elmhurst. Evenson told Hopkins that there were two lines of credit. One of those had been drawn down (with the loan being secured by Evenson's home), and the loan proceeds were in the company.

17. On July 22, before he had submitted any letter of intent to Evenson for the purchase from CNC–Illinois, Hopkins wrote to the State Bank of Hales Corners, Wisconsin and updated pages 4 and 5 of the Business Plan that he had previously submitted to that bank. That July 22 "update" letter stated in part that "terms were agreed in principle yesterday for the acquisition of CNC ... Service Center, Inc., Elmhurst, IL."

18. On July 25 Hopkins gave Evenson the first letter of intent for the purchase of assets from CNC–Illinois on behalf of Cote as purchaser. That letter made no reference to Hopkins as a purchaser but did provide that CNC–Illinois would pay Hopkins a $50,000 commission as broker. It

was never executed, instead being replaced by a new letter of intent dated July 30. That letter also did not disclose Hopkins as a purchaser from CNC–Illinois and continued to provide for the $50,000 in brokerage commission to be payable by CNC–Illinois to Hopkins. Despite the fact that both the July 25 and the July 30 letters of intent had been submitted by Hopkins in Cote's name, the March 25 letter from Hopkins to Cote, which assured Cote that he could elect to have no responsibility for any commitments entered into in contemplation of assignment, was at all times still in full force and effect.

19. On July 31 a handwritten "memo of intent" was initialed by Ettlies and Hopkins providing for the sale of PMA–E and PMS. Then on August 2 Hopkins wrote to attorney Robert Acri ("Acri") transmitting the July 31 "memo of intent" and telling Acri that he would be engaged to "[act] as counsel for Jim [Cote] and I [sic] in our joint endeavors." Hopkins also transmitted to Acri a memorandum as to the acquisition of PMA–E/PMS/CNC–Illinois. That memorandum, reflecting Hopkins' understanding of the points covered on the previous Friday (July 29), addressed the acquisition from CNC–Illinois as well as PMA–E and PMS by Hopkins and Cote and set out that Hopkins would contribute no cash to the venture but would capitalize his CNC–Illinois commission of $50,000 and would "create" $105,000 of "equity" by acquiring PMA–E real estate personally and then immediately selling it back to the venture at a price $105,000 greater than his actual purchase price. It was contemplated that the total cash investment to be made by all parties in the proposed PMA–E/PMS/CNC–Illinois acquisitions was $200,000, comprising Cote's total commitment of $160,000 to the venture and $40,000 to be paid by PMA–E employee John Steker ("Steker"). Steker was, at all times before the sale of PMA–E/PMS, its general manager.

20. Still another letter of intent directed to Evenson was prepared by Hopkins dated August 17, disclosing for the first time that Hopkins *and* Cote would be the purchasers from CNC–Illinois. At no time before August 17 was Evenson ever informed that Hopkins was acting in any capacity other than a broker for CNC–Illinois. When it was thus disclosed that Hopkins would be a purchaser, Evenson objected to the payment of a brokerage fee to Hopkins, and Hopkins and Cote then shifted the liability for the fee to the buying entity.

21. Although it was not disclosed to Evenson until August 17 that Hopkins intended to assume any other role with CNC–Illinois other than his fiduciary relationship as its broker, Hopkins had all along contemplated being on the buyer's side of the CNC–Illinois acquisition—thus dealing with Evenson in an adversary capacity (see Findings 13, 17, 19).

22. Like the two July letters of intent, the August 17 letter of intent was not executed by Evenson. It was followed by another letter of intent on August 20, which in turn was replaced by an August 21 letter of intent. That last document was executed by Evenson and became the "final" letter of intent for the purchase of the assets of CNC–Illinois (as Finding 26 reflects, the final purchase document was an Asset Purchase Agreement dated October 1). Hopkins and Cote executed the August 21 letter of intent to purchase assets from CNC–Illinois as promoters of CH Holdings Inc., but that corporation was never formed. Instead Hopkins and Cote formed a Wisconsin corporation known as CNC Service Center, Inc. ("CNC–Wisconsin") on October 15 (its Articles of Incorporation bore a September 30 execution date) to consummate the purchase of the assets of CNC–Illinois.

23. On August 25 Hopkins, Cote and Steker formed a Wisconsin corporation known as CH, Inc. to acquire the assets of PMA–E and PMS. On August 31 CH, Inc. acquired those assets. Then on September 10 CH, Inc. amended its Articles of Incorporation to change its name to PMA. For all purposes of this litigation CH, Inc. and PMA shall be considered and are one and the same.

24. Upon PMA's acquisition of the PMA–E/PMS assets Hopkins began draw-

ing an annual salary of $75,000. Before that acquisition, Hopkins reported receiving no other income from any other source during 1987. Hopkins drew that salary notwithstanding the facts (a) that PMA–E/PMS had been in financial difficulty and PMA continued to be in at least as great difficulty thereafter and (b) that during their ownership of the precedessor companies Ettlies had taken far more modest salaries—$17,400 per year each. Even worse, Hopkins and Cote thereafter actually accelerated the drain on PMA by drawing far larger salaries even while the corporate finances deteriorated (see n. 15).

25. Immediately after Hopkins and Cote came into control of the PMA–E/PMS assets, Hopkins began holding off payments on all accounts payable other than insurance, union dues, pensions and utilities—allowing the other accounts payable to go over 90 to 120 days due and creating all manner of problems with the companies' operations (such as the refusal of suppliers to ship other than on a COD basis). Hopkins also drastically changed how PMA's bookkeeping was done, to the extent that PMA lost control of its financial information because accounts weren't being posted. In contrast to Ettlies, who had been very precise in their recordkeeping (though the companies were in difficult financial straits) and who had made honest efforts to keep up payments to all vendors, Hopkins caused the handling of such business affairs to deteriorate substantially at PMA.

26. On October 1 the purchase of CNC–Illinois' assets took place pursuant to the terms of an Asset Purchase Agreement executed between CNC–Illinois as seller and CNC–Wisconsin as buyer. Although Asset Purchase Agreement § 1.5 recites the purchase price as $540,000, it was in fact $590,000. That disparity is accounted for by the fact that part of the consideration was represented by CNC–Wisconsin's assumption of CNC–Illinois' $50,000 line of credit obligation with the Bank of Elmhurst ("Bank") (see Asset Purchase Agreement § 1.5(a)(4) and this Court's opinion

(the "Opinion," 731 F.Supp. 293, 296–97 (N.D.Ill.1990)[5]), adopting the report and recommendation of Magistrate Bernard Weisberg in that respect).

27. This Court found Evenson to be a far more credible witness than either Hopkins or Cote as to the events leading up to the execution of the Asset Purchase Agreement and Evenson's Employment Agreement (as to the latter, see Finding 34). This Court also found that the witnesses supporting Evenson's account bearing on the representations that had been made (or not made) as to the CNC–Illinois assets and business were more credible than the witnesses called in support of the allegations advanced by CNC–Wisconsin, PMA, Hopkins and Cote in that respect. This Finding will not recite the detailed testimony as to those allegations, but will instead set out this Court's factual findings on the relevant issues in summary form:

(a) Evenson's description to Hopkins of CNC–Illinois' business (including its assets and its personnel) during their initial June 16 meeting was essentially truthful and accurate. Hopkins' several claims of misrepresentations that he said were made by Evenson during the course of that meeting were not credible as to any material matters.

(b) That was also true of the second meeting between Evenson and Hopkins on July 17.

(c) That was also equally true of the August 17 meeting between Evenson on the one hand and Hopkins and Cote on the other. In particular, although Hopkins and Cote pretended to be potential purchasers of the two Weidemann punch presses when they were viewing them in the CNC–Illinois plant, that was merely done as a cover story suggested by Evenson (who understandably did not want to disclose to his employees that he was thinking of selling the business in case no agreement was in fact reached). What is far more relevant is that Evenson made no misrepresentations to Hopkins and Cote about the working condi-

5. All further references to the Opinion will take the form "Opinion at—," citing the appropriate page in F.Supp. but omitting the F.Supp. volume number.

tion of those punch presses or of any associated control systems, either during the August 17 meeting or at any other time before the October 1 closing.

(d) Nor did Evenson make any misrepresentations to Hopkins during the latter's due diligence review conducted at the CNC–Illinois premises on September 3.

(e) At the October 1 closing, Evenson provided Hopkins with current lists of accounts payable and receivable of CNC–Illinois, which reflected that the former exceeded the latter rather than the totals being approximately equal (as had earlier been anticipated). That differential led to the establishment of an escrow account using a portion of the cash that had been expected to be paid to Evenson at the closing, with the amount in the escrow account being held subject to a future accounting when the final amounts were ascertained. In November a final settlement of $9,500 was reached as being the amount due Evenson out of that account, and that amount was then paid to Evenson in January 1988. That mutual agreement and its resolution give rise to no claims on either side.

(f) Although CNC–Wisconsin has claimed that Evenson and CNC–Illinois misrepresented (1) the functional ability of the Cosmos retrofit system and (2) the experience of the CNC–Illinois personnel in retrofitting, that claim is rejected. On the contrary, the actual situation in those respects was not at all materially misstated by Evenson during the discussions leading up to the Asset Purchase Agreement. Indeed, CNC–Illinois' competitive place in the retrofit business was con-

firmed by the testimony of independent witness Monty Mrotz (who was an application analyst and field application engineer for Allen Bradley Company ("Allen Bradley"), the manufacturer of the 8200 and 8600 CNC controls worked on by CNC–Illinois) [6] and William Moore (who was also a project engineer at CNC–Illinois and became the team leader there after Jarmy left).

(g) It is true that CNC–Illinois office manager Joseph Rehberger ("Rehberger") sent a letter to Allen Bradley cancelling the previously-existing standing blanket order for that company's controls shortly before the October 1 closing under the Asset Purchase Agreement. But that decision by Rehberger was based upon his knowledge of what controls were on hand in inventory and of the orders being received by CNC–Illinois for further retrofitting, as well as the facts that the controls were very expensive and that there was a need to protect CNC–Illinois' account payable position. Indeed Rehberger's testimony (which this Court credits) was that he was really seeking to protect CNC–Wisconsin by cancelling the blanket order. Rehberger was uncertain whether the cancellation was made pursuant to Evenson's direction, while Evenson had no recollection of discussing the cancellation with Rehberger. In all events, the cancellation involved no misrepresentation to CNC–Wisconsin either before or at the October 1 closing.

To summarize matters as to CNC–Wisconsin's misrepresentation claims in a different manner, it failed to prove, as misrepresentations by Evenson and CNC–Illinois,

---

6. CNC–Wisconsin called as a witness Computer Integrated Manufacturing Technician Daniel Jarmy ("Jarmy") of Trane Company (Jarmy was formerly a CNC–Illinois project engineer). Jarmy essentially confirmed the same sense of affairs that this Court derived from the testimony of Mrotz and some of the other technical witnesses: that retrofitting is more of an art than a science, that a good deal of the work depends upon trial and error and that CNC–Illinois was (as Mrotz testified) one of the more qualified companies in the retrofit business. Viewing matters most charitably to CNC–Wisconsin, it might be said that Hopkins misunderstood Evenson's pre-closing explanations of technical matters regarding the retrofit business as being more positive and precise representations than they really were. Viewing the CNC–Wisconsin claims less charitably (as seems more appropriate in light of Hopkins' general lack of credibility), it is substantially more likely that Hopkins has altered the nature of his discussion with Evenson to make it sound as though factual misrepresentations were made by Evenson when they were not.

*any* of the matters set out in Complaint ¶¶ 16(a) through 16(*o*) and in Complaint Count II ¶¶ 36(a) through 36(*o*).

28. Despite CNC–Wisconsin's express agreement to assume the CNC Illinois $50,000 indebtedness to Bank, PMA thereafter refused to pay that amount when requested to do so by Bank.[7] Hopkins and Cote admit that at the time PMA failed to make that payment, Hopkins and Cote knew that Evenson was personally obligated on the line of credit to Bank and that it was secured by a mortgage on his home. They further admit that such failure to pay was intentional. Although they assert that PMA was unable to make that payment because of its inability to use the assets purchased from CNC–Illinois as collateral for additional financing,[8] this Court does not credit that contention as justifiable.

Instead any inability on the part of PMA to pay the $50,000 obligation—or indeed to obtain further financing on the security of the assets encumbered by that existing indebtedness to Bank—was caused by the inordinately thin capitalization that Hopkins and Cote had chosen for PMA and by their own drawing down of substantial salaries despite its poor business performance, thus disabling it from meeting its business obligations as they came due.[9] That undercapitalized condition was exacerbated not only by Hopkins' and Cote's own financial drawings from PMA but also by Hopkins' lack of adequate skilled attention to its business and financial affairs after the acquisition from CNC–Illinois.[10]

29. As the consequence of the nonpayment of the $50,000 indebtedness to Bank as demanded, Bank obtained a judgment

7. This Finding refers to *PMA's* refusal rather than that of CNC–Wisconsin, because Hopkins and Cote caused the acquired CNC–Illinois assets to be transferred to the former rather than the latter, leaving CNC–Wisconsin an empty shell, as it has remained to this day (see Finding 39). For the same reason, other Findings and Conclusions also speak of PMA and its financial responsibility for liabilities that would otherwise be those of CNC–Wisconsin. However, a Bankruptcy Court order entered May 7, 1990 in PMA's pending Chapter 11 proceedings in Milwaukee (see Finding 38(d)), while modifying the automatic stay sufficiently to allow Evenson and CNC–Illinois to continue with their prosecution of this lawsuit "to liquidate the claims owing between [PMA] and Evenson," precluded the entry of any *judgment* against PMA. Accordingly the judgment order provided for at the end of these Findings and Conclusions will simply declare the existence and amount of PMA's liability to Evenson, without entering a judgment for that amount against PMA.

8. Opinion at 296–99 held that CNC–Illinois had breached its warranty of title because certain of its assets were also collateralized to secure the Bank indebtedness. That holding, which was predicated on the parties' submissions on CNC–Wisconsin's summary judgment motion on Complaint Count I, is not modified by the Findings and Conclusions stated here, which are based on the full evidentiary presentations of the parties at trial.

9. Cote's testimony disclosed that the PMA–E/PMS acquisition had not worked out as he and Hopkins had anticipated—that what they had expected would be cash available for operation of the total business venture was not, because of the large number of unpaid creditors

and the disappointing cash flow in relation to the pro forma projections. This Court's adverse findings as to Hopkins and Cote are not at all vitiated by their furnishing of personal guaranties to their bank (Park Bank East) in connection with its extending corporate loans to PMA—what they did in that respect did not suffice to meet the corporation's demonstrated needs, and once again they could not fairly withdraw the large sums that they did for themselves, rather than leaving enough added funds in the corporation so that it could honor its commitment to pay off Bank's $50,000 (which would have both freed up the pledged corporate assets and spared Evenson the serious damages that he sustained when Bank pursued him individually to collect the indebtedness).

10. In its totality the evidence discloses a financially sophisticated freebooter—Hopkins—trying to swing two substantial acquisitions with the assistance of a single investor (Cote) and with capitalization so inadequate as to be highly risky. Hopkins himself sought to "finance" his own equity participation by the "creation" of paper values—not cash. That may sometimes be a legitimate means of corporate structuring, but it was not in this instance—particularly when thereafter aggravated by the excessive salaries drawn by Hopkins and Cote. Not only is there no justification under the circumstances for Evenson having to suffer the consequences of the judgment that Bank obtained against him as the result of PMA's nonpayment of the $50,000 obligation to Bank that CNC–Wisconsin had assumed, but it is entirely without justification to attempt to saddle Evenson with the consequences of Bank's foreclosure—which would have been averted entirely by that $50,000 payment.

against Evenson on March 10, 1990 in the amount of $55,586.26, which judgment carries interest at the statutory rate of 9% per annum. Evenson was unable to mitigate his damages by making payment to Bank when demanded because his sources of funds for such purposes had been cut off by PMA, Hopkins and Cote. In addition to the damages that Hopkins and Cote caused Evenson by that conduct ($55,586.26 plus $13.71 per diem in interest), Asset Purchase Agreement § 10.2 provides for the payment of CNC–Illinois' (now Evenson's) attorney's fees and costs in the event of any breach of its terms. Those include all of such expenses of this litigation (see Finding 43) and $1,285 paid by Evenson in defending Bank's action referred to in this Finding.

30. Another part of the consideration for the purchase of the assets of CNC–Illinois also included the issuance of 10% of the stock of CNC–Wisconsin to CNC–Illinois. Those shares (100 in number) were in fact issued to Evenson by CNC–Wisconsin after the October 1 closing date. As Cote testified, those shares were issued to Evenson to provide him with a "golden carrot" to make him "stick around"—to maintain his continued involvement in the business. Beginning as early as December, Hopkins began to approach Evenson in an effort to reacquire that stock interest in CNC–Wisconsin. Evenson rejected those suggestions until approximately March 1988, when it became necessary for Evenson to sell his CNC–Wisconsin stock because of the financial difficulties that he was experiencing due to the delay and cessation of payments owed to him by CNC–Wisconsin. Steker purchased the shares for $13,000 with the assistance of Hopkins, who represented that he would take care of the paperwork.

31. Asset Purchase Agreement § 1.5(b) provided for the payment, as part of the consideration for the transaction, of the sum of $410,000 in cash, evidenced by two notes in the principal amounts of $370,000 and $40,000. In May 1988 all further interest payments under the $370,000 note were

stopped. Moreover, the $40,000 note was not paid in accordance with its terms when it became due on October 1, 1988, nor has any amount of principal ever been paid on the $370,000 note.

32. Evenson is owed, on the $370,000 note, the principal sum of $370,000 plus interest at the rate of 10.5% per annum from and after May 1988 (a per diem rate of $106.44). In addition, both the note and Asset Purchase Agreement § 10.2 provide for the payment of CNC–Illinois' (now Evenson's) attorney's fees and costs in the event of a default.

33. Evenson is owed, on the $40,000 note, the principal sum of $40,000 plus interest at the rate of 5% per annum [11] from and after October 1, 1988 (a per diem rate of $5.48). In addition, both the note and Asset Purchase Agreement § 10.2 provide for the payment of CNC–Illinois' (now Evenson's) attorney's fees and costs in the event of any such default.

34. As another part of the transaction involving the sale of assets by CNC–Illinois to CNC–Wisconsin, the parties entered into an Employment Agreement under which Evenson was to be employed by CNC–Wisconsin at the rate of $40,000 per year from October 1, 1987 to September 30, 1988. Employment Agreement ¶ 3 further provided that unless either party delivered to the other party a written notice of an intention not to renew at least 90 days before the expiration of the original term, the agreement would be automatically renewed for another one-year term. In addition to the $40,000 annual base salary, Evenson was also to receive fringe benefits not to exceed $7,000 per year.

■ 35. In May 1988 Hopkins caused the cessation of payment of any further compensation to Evenson under the terms of the Employment Agreement. That was based on Evenson's purported breach of his fiduciary obligation by making a business proposal to MSI under which he would become the head of its service department, while at the very same time CNC–Wisconsin was negotiating the sale of *its* service

---

**11.** Ill.Rev.Stat. ch. 17, ¶ 6402 provides for that rate of interest after the due date of any note.

department to MSI. That claim is wholly groundless. In fact Evenson approached MSI *at Hopkins' request* to see whether it would be interested in purchasing the CNC–Wisconsin service business. MCI's David Vock confirmed Evenson's testimony that no violation of Evenson's noncompetition agreement had been sought by MSI or Evenson, nor was any contemplated (Vock testified that if an agreement to acquire CNC–Wisconsin's business had in fact been reached, MSI absolutely would not have employed Evenson—who at that point would no longer have any real job function with CNC–Wisconsin [again more accurately PMA]—without a release from CNC–Wisconsin).

 36. Although Evenson also contends that no notice of any intention not to renew was ever sent or received by Evenson 90 days before the end of the original term of the Employment Agreement, the termination of Evenson's employment by CNC–Wisconsin effective in May 1988 must be considered as the equivalent of such a notice. Accordingly, Evenson's total term of employment was for the initial contract year, and the amount due him consists of the unpaid base salary and fringe benefits for the period ended September 30, 1988: four months of compensation at the rate of $3,333 per month plus fringe benefits at the rate of $583 per month, or an aggregate of $15,664, plus prejudgment interest at the annual statutory rate of 5% [12] for each unpaid monthly payment of $3,916 ($16.33 per month per monthly payment).

37. Almost immediately after the October 1 closing date, the relationship between Hopkins and Evenson began to deteriorate. Hopkins treated Evenson badly in front of company personnel and let it be known that he didn't value Evenson's opinion. Hopkins also began to use any incident, however slight, as an excuse to threaten Evenson with termination and to withhold payments due to Evenson. Although Asset Purchase Agreement § 11.13 required CNC–Wisconsin to furnish quarterly financial statements until all its payment obligations were fully satisfied, no such financials were ever provided to Evenson at any time. Hopkins testified that a quarterly financial statement was given to Evenson in December 1987, but that was untrue: Instead the evidence established that no financial statements were ever produced by CNC–Wisconsin; no quarterly statements were ever produced by PMA in that format; and the PMA quarter-end monthly financial statements that Hopkins testified he had given to Evenson were not even in existence as of December 1987.

38. Hopkins' post-closing relationship with Ettlies after the acquisition of PMA–E/PMS followed somewhat the same stormy course as has been disclosed by this litigation with respect to Evenson:

(a) Despite Hopkins' pre-closing familiarity with the operations of PMA–E/PMS, acquired both during his short-term relationship as PMA–E's financial and business consultant and during his prepurchase due diligence investigation, and despite the fact that the knowledgeable Steker remained in the business as Hopkins' and Cote's associate investor, Hopkins failed and refused to make the first payments due to Ettlies on November 30, 1987 under the PMA–E/PMS purchase agreement, on the claim that Ettlies had made misrepresentations to Hopkins as to the status of various job activities.[13]

---

12. Ill.Rev.Stat. ch. 17, ¶ 6402 also provides for such interest in case of any vexatious nonpayment of any monies after they become due. That applies to the nonpayment to Evenson here, in which Hopkins seized on a claimed but nonexistent breach of Evenson's fiduciary obligations as an unjustified excuse for stopping the payment of his compensation and fringe benefits.

13. Interestingly, Hopkins did so despite the presence in the PMA–E/PMS purchase agreement (originally drafted by Ettlies' attorneys) of the same "as is" language that was later included in the Asset Purchase Agreement. Indeed, the Ettlies purchase agreement was the model later used by Hopkins' attorney Acri to prepare the Asset Purchase Agreement. Apparently Hopkins sought to exercise the same kind of ingenuity to avoid payment obligations in both transactions, despite the limitation-of-seller-liability intention that was evidenced by the inclusion of "as is" clauses in each agreement.

(b) Ettlies proceeded to file suit against PMA on January 22, 1988 in Milwaukee. That suit was then settled by a modification of the promissory note payable to Ettlies, so as to reflect the potential for claimed chargebacks to them under the purchase agreement from them.

(c) Because PMA thereafter continued to refuse to pay amounts due Ettlies under the promissory note, Ettlies again found it necessary to bring suit in Milwaukee on January 3, 1990. Despite the provision in the earlier settlement that PMA could file an amended pleading in the first lawsuit if Ettlies were refusing to negotiate in good faith regarding chargebacks, PMA once again simply refused to pay on the note—asserting as its defense exactly the same basis as it had alleged in the 1988 litigation.

(d) On March 21, 1990 PMA filed its petition in bankruptcy in the United States Bankruptcy Court for the Eastern District of Wisconsin in Cause No. 90–01442, listing Ettlies as a creditor in the aggregate amount of $172,330.

Despite the apparent similarity between Hopkins' efforts to avoid payment of the wholly justified and legitimate obligations in this case and his conduct vis-a-vis Ettlies, however, the record in this case is insufficient for this Court to find that the latter activity was actually fraudulent—either in the inception of the Ettlies transaction or in the post-closing course of nonpayment to them.

■■■ 39. Immediately after the CNC–Illinois asset purchase closing, all records and financial information as to the transaction were recorded not on the books of CNC–Wisconsin but instead on the books of PMA. There was no consideration recited or given in exchange for any transfer of those assets to PMA rather than to CNC–Wisconsin, but there is no question that it took place in that manner and that CNC–Wisconsin simply remained an empty corporate shell without any assets and without any operations (see also Finding 42). That handling of the initial acquisition, and the continued entry of all post-closing transactions on the same PMA books with no separate books of account being set up for CNC–Wisconsin, had more than one result:

(a) PMA's financial statements did not fairly disclose the financial position or the results of operations of CNC–Wisconsin, either as such or in any form derivable from those statements.

(b) It was also not possible to produce the usual and customary financial statements (balance sheets or profit-and-loss statements) for CNC–Wisconsin separately—or for any of the other corporations involved either.

(c) There is consequently no way to ascertain what assets constitute the potential source of recovery for Evenson's claims.

(d) CNC–Wisconsin is not the real party in interest for any of the claims that it purports to advance in this action.[14]

(e) No proper separation of the corporate entities was maintained under the control of Hopkins and Cote. That, coupled with their substantial draining of the businesses' value for their personal benefit[15] while the business operations were failing and the businesses could not honor their obligations (such as the $50,000 payable to Bank), calls for "piercing the corporate veil" of both CNC–Wisconsin and PMA and rendered those corpora-

---

**14.** This Court pointed out that potential problem to CNC–Wisconsin's counsel on a number of occasions during the trial, but he made no effort to cure the problem. Under the circumstances there is no reason to consider permitting a post-trial cure—even if such a cure were possible—if CNC–Wisconsin were otherwise entitled to recover on any of its claims.

**15.** Despite the consistent decline in the business operations of the combined venture after their takeover, Hopkins received $75,000 in compen-

sation in 1988, and Hopkins, Cote and Steker then withdrew the following amounts as compensation from PMA (which, as already stated, included the commingled assets of CNC–Wisconsin acquired from CNC–Illinois) during the year preceding PMA's bankruptcy filing in March 1990:

| | |
|---|---|
| Hopkins | $119,739.00 |
| Cote | 114,721.50 |
| Steker | 123,025.00 |

tions the alter egos of Hopkins and Cote for purposes of this litigation.[16]

40. In about May 1988, while the remaining assets and liabilities derived from the CNC–Illinois acquisition were still reflected (although without the proper separation) on PMA's financial statements, Hopkins removed from PMA's books any reference to the CNC–Wisconsin liabilities to Evenson for the purchase of the CNC–Illinois assets. Instead Hopkins caused the transaction to be reflected as an account receivable from Evenson in the approximate amount of $390,000, premised on the fact that Hopkins had unilaterally elected to rescind the CNC–Wisconsin purchase agreement with CNC–Illinois. Those entries were improper, deceptive and not consistent with generally accepted accounting standards, and they resulted in an intentional misstatement of PMA's net worth by shifting it from a negative net worth of approximately $175,000 to a positive net worth of approximately $75,000—even though expert testimony indicated that PMA's operating revenues had not improved during the period of the adjustment. Those entries made in May 1988 were used in connection with representations made to the Park Bank East in 1989 to obtain a renewal of PMA's loan obligations to that bank.

41. On June 13, 1988 and again on July 11, 1988 Hopkins, through his attorney Merle Royce (who was and is counsel for Cote, CNC–Wisconsin and PMA as well), demanded of Evenson that he either agree to a rescission of the CNC–Illinois agreement with CNC–Wisconsin or accept a renegotiation of the purchase price. At the time of those demands CNC–Wisconsin (or more accurately PMA) had already disabled itself, by the nature of its operations (in-

cluding the commingling of assets and corporate financial books and records), from any ability to consummate a rescission if Evenson had agreed to the rescission demand. Hopkins was fully aware of that, and his demands for rescission were not made in good faith.

■ 42. In addition, although PMA claims to be the owner of all of the shares of stock of CNC–Wisconsin pursuant to a stock swap that Hopkins contends took place in October 1988 with the assistance and participation of attorney Royce, the corporate records of the Wisconsin Secretary of State confirm that no such stock swap can legally have occurred. At the time of its incorporation (as CH, Inc.) PMA was authorized to issue only 2,800 shares of stock, and no amendment to its Articles of Incorporation has ever been filed with the Wisconsin Secretary of State authorizing the issuance of more shares. Yet the asserted "stock swap" of October 1, 1988 purportedly involved the issuance of 44,000 shares each to Hopkins and Cote and 11,-200 shares to Steker, for a total of 99,200 shares. Two other items of objective evidence also refute the PMA claim of CNC–Wisconsin stock ownership through the claimed "stock swap":

(a) Even the stock certificates that are relied upon to evidence said "swap" recite that the corporation's authorized shares number only 2,800 shares.

(b) In direct contravention of the assertion that PMA became the shareholder of all CNC–Wisconsin stock on October 1, 1988, the annual corporate minutes prepared by attorney Royce on June 21, 1989 and reflecting events of December 2, 1988 show Hopkins, Cote and Steker *individually*—and *not* PMA—as the CNC–Wisconsin shareholders.[17]

16. Although this is more accurately a Conclusion rather than a Finding and is further elaborated under the *Hopkins–Cote Personal Liability* section of the Conclusions, it is included here because the practices described in this Finding were some of the factors that have given rise to the legal result just stated in the text.

17. On the other side of the coin, PMA asserted to the federal government a right to file consolidated corporate income tax returns including

CNC–Wisconsin (something that would be possible *only* if PMA owned at least 80% of the CNC–Wisconsin stock) as of October 1, *1987,* and PMA actually filed income tax returns on that basis for its fiscal year ended *July 31, 1988.* That discrepancy in treatment, coupled with the matters set out in the text, bespeaks a blithe disregard of matters of ownership, title, corporate integrity—all the things that contribute to the result stated in the last sentence of this Finding 42. Of course, so far as the tax returns

Like the facts referred to in Finding 39, these matters too confirm that title to the assets was held, and all operations were conducted, by PMA and not by CNC–Wisconsin—and they also reflect the total lack of conformity with corporate requirements that calls for application of piercing the corporate veil and alter ego principles and the imposition of liability on Hopkins and Cote individually.

43. Under both the Asset Purchase Agreement and the notes provided for there, Evenson is entitled to recover all attorneys' fees incurred in any action brought to enforce the covenants and conditions of those documents. In this instance the charges of Evenson's counsel for all work performed to and including March 7, 1990 have been paid or remain due and owing and are therefore fully recoverable in addition to damages. Because of Evenson's lack of funds, however, all his counsel's work performed for him after March 7, 1990 has been performed under a contingency fee agreement between Evenson and attorney Michael Cotteleer calling for counsel to receive ⅓ of any amount recovered from defendants. Any fees recoverable from defendants for those latter services will also be determined based on a further application on Evenson's behalf.

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. This action was originally brought as a diversity-of-citizenship action. If that had remained the only predicate for subject matter jurisdiction, such jurisdiction would not have been destroyed in any event by this Court's determination that CNC–Wisconsin was not the real party in interest (for PMA, like CNC–Wisconsin, is a Wisconsin corporation with its principal place of business in the same state, while none of

the defendants is a Wisconsin citizen). In any event this Court also has jurisdiction over the subject matter of Evenson's Counterclaim under (a) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1965, and (b) the Securities Exchange Act of 1934 ("1934 Act") § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5. Jurisdiction over certain other claims exists under the doctrine of pendent jurisdiction. Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

■ 2. Evenson is the proper party to bring the Counterclaim and Third–Party Complaint as the sole shareholder and successor in interest to CNC–Illinois, a corporation voluntarily dissolved under the laws of the State of Illinois.

### Breach of Warranty of Title

■ 3. Opinion at 295–99 granted summary judgment as to liability against CNC–Illinois (and thus against Evenson as its successor in interest) on CNC–Wisconsin's Count I claim, based on the commission of a breach of warranty of title under Asset Purchase Agreement § 3.3 by reason of the existence of Bank's lien securing the $50,000 indebtedness then owed by CNC–Illinois to Bank. That was a literal breach of the CNC–Illinois warranty of good title even though CNC–Wisconsin had expressly assumed that $50,000 obligation under Asset Purchase Agreement §§ 1.5(a)(4) and 11.12. But CNC–Wisconsin cannot recover any damages for that breach for two reasons:

(a) CNC–Wisconsin is not the real party in interest (see Findings 39 and 42).

(b) Even apart from that, the only damages that were even arguably sustained as a consequence of the breach of warranty were really self-inflicted. If

are concerned it makes no difference whether CNC–Wisconsin is or is not properly part of the consolidated group—as a shell without either assets or operations, it neither added to nor detracted from the results properly reportable for tax purposes by PMA. In fact Hopkins himself signed a statement as part of PMA's consolidated tax return for the year ended July 31, 1988 that explained (emphasis added):

> We are filing a single tax return due to the fact that Precision Machine Control and *CNC*

*Service Center* [CNC–Wisconsin] *were inactive, had no revenue or expense, no assets or liabilities and no employees.*

In the face of that express admission, it is almost unbelievable that knowledgeable counsel would not only file this action on behalf of CNC–Wisconsin but would persist in that mode even after the matter had been drawn to his attention both by Evenson's counsel and this Court (see n. 14).

CNC–Wisconsin (or in this instance PMA) had complied with its own express obligation to pay the $50,000 owed to Bank, the Bank lien on the acquired assets would have been extinguished and the technical breach of warranty would have been rendered of no effect and moot. And as Findings 28 and 39(e) and nn. 10 and 11 reflect, the nonpayment of the $50,000 was a direct breach of CNC–Wisconsin's and PMA's own obligations that cannot either be excused or ascribed to CNC–Illinois or to Evenson.

■ 4. Nor can CNC–Wisconsin rescind the transaction by reason of that breach of warranty of title. Even apart from CNC–Wisconsin's and PMA's having disabled themselves from carrying out an effective rescission—a factor that should independently foreclose any such result—the matters set out in Conclusion 3 make the unavailability of any rescission remedy an a fortiori conclusion. It would be extraordinarily inequitable to grant CNC–Wisconsin such an equitable remedy when it suffered absolutely no harm that was fairly and properly ascribable to the breach of warranty.

### Common Law Fraud

5. Both Wisconsin and Illinois (like all other common law jurisdictions) require proof of the same elements to establish a claim for fraudulent misrepresentation, as succinctly stated in *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) (citations omitted): [18]

> As disclosed by decisions of this court, the elements of a cause of action for fraudulent misrepresentation (sometimes referred to as "fraud and deceit" or "deceit") are: (1) false statement of material fact (2) known or believed to be false by

the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

### A. Claims Against CNC–Illinois and Evenson

■ 6. Complaint ¶ 35 charges CNC–Illinois and Evenson with fraud in the inducement of the Asset Purchase Agreement by their having made representations as to the unencumbered condition of the assets that were false in light of Bank's lien securing the $50,000 obligation—the identical subject matter that has just been dealt with as a breach of warranty of title. Although Opinion at 296–99 has found that the no-lien provision of Asset Purchase Agreement § 3.3 was clear and unambiguous and was breached by the delivery of the CNC–Illinois assets subject to Bank's lien, again it must not be forgotten that CNC–Wisconsin directly assumed the payment of the entire $50,000 obligation to Bank that gave rise to that lien. There has been no showing of a deliberate falsehood or intent to deceive on the part of Evenson or CNC–Illinois in that respect. This Court concludes that at least two of the necessary elements of a cause of action for fraud as stated in Conclusion 5—the intention that the other party rely detrimentally on the representation and the existence of any damage caused by such reliance [19]—are lacking. CNC–Wisconsin cannot recover on that claim.

7. As for the remainder of CNC–Wisconsin's Count II common law fraud claim (the matters set out in Count II ¶ 36), Finding 27 has already found against CNC–Wisconsin in all respects as a matter of fact. It necessarily follows that the claim fails as a matter of law.

---

18. Because the applicable legal principles are indeed universal, there is no need to see which if any of the claimed misrepresentations would be judged by Illinois law and which by Wisconsin law under the appropriate choice-of-law rules (see *International Administrators, Inc. v. Life Insurance Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985) ("Conflicts rules are appealed to only when a difference in law will make a difference to the outcome")).

19. As for the other element of a common-law fraud claim that is sandwiched in between the two referred to in the text—actual reliance on the representation—this case might be perceived as presenting a mixed bag. It might be argued that CNC–Wisconsin (more accurately PMA) did rely on the representation, in the sense that it could perhaps have arranged for other financing with the assistance of the acquired assets if it had taken them over free and clear of the $50,000 owed to Bank (thus leaving Bank's $50,000 receivable wholly unsecured). But the

*B. Claims Against Hopkins and Cote*

■ 8. As for Evenson's claims of fraud, the Findings are replete with instances of deceptive and otherwise improper conduct by Hopkins (and to a lesser extent by Cote). But the difficulty is that even though such misconduct certainly caused major financial harm to Evenson—measured by the damages that are attributable to the breaches of the Asset Purchase Agreement and Employment Agreement—the misconduct cannot be said to have caused CNC–Illinois and Evenson either (a) to have entered into those agreements in reliance on the misrepresentations or (b) to have acted in reliance on any post-contract misrepresentations to their detriment. Instead the situation that emerged at trial was that Hopkins and Cote entered into the asset purchase transaction with the intention and hope that it would prove successful, and that any pre-purchase misrepresentations on their part did not qualify as common law fraud. It is true that all the machinations that Hopkins and Cote engaged in once they acquired control of the business and found that their hopes were not being realized have certainly damaged Evenson, but it is difficult to place that scenario under the rubric of fraudulent representation by identifying any post-closing representations that they made to *Evenson* or *CNC–Illinois* to which any resulting *reliance* damages may be traced. It suffices that full recovery (including attorneys' fees) is obtainable by Evenson on the breach-of-contract grounds discussed later. Evenson's fraud claim is dismissed.

### *Evenson's Alleged Breach of Employment Agreement*

9. Opinion at 304–05 found that CNC–Wisconsin's Count III had survived—but that was so because its factual allegations were then accepted as correct. Now Finding 35 has demonstrated CNC–Wisconsin's inability to sustain its burden of proving those allegations. Once again its failure in factual terms dooms the claim as a matter of law. It is dismissed.

### RICO

■ 10. As for Evenson's RICO claim, the evidence adduced in this action with respect to the Ettlies transaction (the PMA–E/PMS acquisition), although to be sure disturbing (see Finding 38), does not suffice to establish mail fraud against Ettlies on the part of Hopkins or Cote or any of their corporations. That being true, all that remains as a potential RICO springboard is the Hopkins–Cote conduct vis-a-vis CNC–Illinois and Evenson. And that alone fails to satisfy the essential "pattern" ingredient of a civil RICO claim as emphasized in the now-famous footnote 14 of *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) and as explicated in a series of post-*Sedima* decisions by our Court of Appeals, most recently in *Hartz v. Friedman*, 919 F.2d 469, 472–73 (7th Cir. 1990).[20] Evenson's RICO claim is also dismissed.

### *Breach of Contract*

11. CNC–Wisconsin, PMA, Hopkins and Cote have admitted that valid contracts were entered into by CNC–Wisconsin (a) with CNC–Illinois (the Asset Purchase Agreement) for the payment of $40,000 and $370,000 (each of those obligations also being evidenced by a promissory note) and (b) with Evenson (the Employment Agreement) for the payment of wages at the rate of $40,000 per year and fringe benefits at the rate of $7,000 per year. This Court has

---

Findings on that score have already demonstrated why any such reliance would have been unjustified—they have shown that the problem rather stemmed from Hopkins' and Cote's efforts to carry the venture on without enough funds, something that would have been readily curable by their causing the $50,000 Bank loan to be paid either through the infusion of capital that should have been there in the first place or through not draining the business of needed funds by lining their own pockets instead.

**20.** In part *Hartz, id.* at 473 points out:

> The Seventh Circuit, however, does not look favorably on relying on many instances of mail and wire fraud to form a pattern.

As with so many efforts by litigants to bring civil RICO into play, Evenson seeks to rely on precisely those acts and those acts alone as the claimed predicate acts. Once Evenson's RICO universe is narrowed to the CNC–Illinois transaction alone, the failure of his RICO claim is inevitable.

also found the existence of contract liability on the part of CNC–Wisconsin and PMA (and, for reasons stated hereafter, Hopkins and Cote as well) for the payment of the CNC–Illinois $50,000 obligation to Bank.

■■■■ 12. CNC–Wisconsin, PMA, Hopkins and Cote have admitted that all payments that were to be made to Evenson either individually or as successor in interest to CNC–Illinois were stopped in May 1988. This Court has made the findings (a) that their conduct in doing so was not justified and was in breach of the covenants of the Asset Purchase Agreement and the Employment Agreement and (b) that CNC–Illinois and Evenson had fully performed their own contractual obligations under the terms of both those agreements, except for this Court's previous ruling that CNC–Illinois had breached its warranty of title (a breach that has now been found to have been purely technical and not material, causing no damage).

13. Evenson is entitled to statutory prejudgment interest at the rate of 5% per annum pursuant to Ill.Rev.Stat. ch. 17, ¶ 6402, on all sums due and owing from CNC–Wisconsin, PMA, Hopkins and Cote where a specific rate of interest is not otherwise provided for.

14. Evenson's contract damages, both individually and as successor to CNC–Illinois, comprise the following amounts inclusive of interest:

(a) for nonpayment of the amount of the CNC–Illinois line of credit with the Bank of Elmhurst, the amount as reduced to judgment in favor of Bank against Evenson (to which shall be added prejudgment statutory interest of 9% per annum from and after March 10, 1990) $ 55,586.26

(b) for nonpayment of the note in the principal amount of $370,000 (to which shall be added the note-provided interest of 10.5% per annum from and after June 1, 1988) $370,000

(c) for nonpayment of the note in the principal amount of $40,000 (to which shall be added prejudgment statutory interest of 5% per annum from and after June 1, 1988) $40,000

(d) for nonpayment of the compensation plus fringe benefits under Evenson's Employment Agreement from June 1, 1988 through September 30, 1988 (to which shall be added prejudgment statutory interest on each installment in the amount of 5% from and after its due date) $15,664

(e) Evenson's attorney's fees incurred in defending Bank of Elmhurst's suit on the obligation referred to in Conclusion 14(a) as the necessary consequence of the conduct of CNC–Wisconsin, PMA, Hopkins and Cote $1,285

(f) Evenson's attorney's fees and costs incurred in this action Amount to be supplied

### Securities Fraud

15. Evenson's burden under 1934 Act § 10(b) and SEC Rule 10b–5 promulgated thereunder has been capsulized in *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989) (citation omitted):

In order to state a claim under Rule 10b–5, 17 C.F.R. § 240.10b–5, the plaintiffs must demonstrate that the Bank: (1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) in connection with a securities transaction, (3) with the intent to mislead, and (4) which caused plaintiff's loss.

In this instance the securities that are the basis of Evenson's 1934 Act claim are the 100 shares of CNC–Wisconsin stock sold to him pursuant to Asset Purchase Agreement § 1.5(b)(3).

■■■■ 16. Even though the liability-triggering condition under 1934 Act § 10(b) must be "in connection with the purchase or sale of any security," Evenson wrongly emphasizes—just as in his already-rejected fraudulent misrepresentation claim—*after-the-fact* misconduct by Hopkins and Cote. But for any such later misconduct to be actionable as securities fraud, it must evidence misrepresentations or nondisclosure that preceded and induced the sale of securities. Evenson's approach to the matter is manifested by his proposed Conclusions of Law 31 and 32 (copied verbatim, errors and all):

31. Pursuant to those findings of fact made in this cause regarding the failure of defendants to disclose material facts which should have been disclosed to Evenson regarding the true state of defendants relationships with each other, their

plans and intentions to comingle assets of CNC Wisconsin with those of PMA and their plans and intentions to further their financial objective by means of deceptive information given to third party commercial lenders all pursuant to 17 C.F.R. § 240.106–5, defendants Cote and Hopkins and each of them have committed and are guilty of the use of a deceptive contrivance in violation of Para 15 U.S.C. § 78j and as such are liable to Evenson for his actual damages arising from the sale of his business, which involved and was induced, in material part, by the issuance of CNC Wisconsin stock to Evenson.

32. Defendants liability arises as the direct and proximate cause of defendants inducement to Evenson that he should agree to the sale of the assets of CNC Illinois to a corporation known as CNC Wisconsin, in return, inter alia for a "stake" in said corporation represented by 10% of the outstanding shares of said corporation, being 100 shares. Said shares were, in fact, issued to Evenson, although the evidence introduced at trial indicates that defendants never intended that Evenson should remain a long-term shareholder, because once possession and control of CNC Illinois assets were obtained through the instrumentality of a corporation which did not exist at the date of closing on October 1, 1987, and which never ratified or adopted said asset purchase agreement, defendants used the leverage of no personal liability in the transaction to verbally abuse Evenson and withhold payments from Evenson to force his early sale of CNC Wisconsin stock in their namee, John Steker.

▮▮▮▮ 17. This Court has rejected the notion that Hopkins and Cote had in mind, at the time that they were putting together the acquisition deal with Evenson, the course of improper conduct that has been detailed in the prior Findings and Conclusions here—a course of action that they later launched when the acquired businesses did not turn out as they had hoped but when they still wanted to derive the personal benefits of substantial salaries for themselves. Only three of the matters that are set out in Evenson's proposed Conclusions as quoted above could arguably qualify as any predicate for securities fraud liability:

(a) As for the "true state of defendants['] relationships with each other," it is quite true that Hopkins did not originally disclose his involvement on the buyer's side of the transaction, and thus concealed the conflict of interest between that involvement and his fiduciary position as broker for CNC–Illinois and Evenson. But on August 17 Hopkins' position *was* disclosed to Evenson, so that the October 1 securities transaction was untainted by the earlier nondisclosure.

(b) As for "their plans and intentions to comingle [sic] assets of CNC Wisconsin with those of PMA," nothing suggests that could constitute a nondisclosure impacting on the value of the stock sold to Evenson. From the very beginning Hopkins had disclosed to Evenson that the acquisition from CNC–Illinois was being pursued precisely because of its perceived "fit" with the other acquisition that was then in the works—the PMA–E/PMS transaction. And Asset Purchase Agreement § 1.5(b)(3) itself provided that Evenson's 10% interest in CNC–Wisconsin "can be converted within one year (1) to an equal amount of stock in Purchaser's other Company namely Precision Machine Alignment, Inc., a Wisconsin Corporation." Although that provision was certainly badly drawn—it sounds as though it gave Evenson an optional shift *out of* CNC–Wisconsin and *into* PMA—it appears more likely that the reference to "converted" indicates an option for Evenson to become an equivalent 10% owner in PMA *as well as* in CNC–Wisconsin. But in any event, Evenson cannot complain of his actually having acquired from the very beginning an ownership interest in the total venture that resulted from the complained-of commingling.[21] Again no actionable securities fraud has been shown.

---

21. As already held in these Findings and Con-

clusions, that commingling did damage CNC–Il-

(c) As for the contention "that defendants [sic] never intended that Evenson should remain a long-term shareholder," this Court rejects that as a factual matter. There is no basis for believing that if the post-closing falling out among the parties had not taken place Hopkins and Cote would have sought to eliminate Evenson as a shareholder.[22]

In sum, Evenson has not demonstrated the existence of fraud "in connection with the purchase or sale" of his CNC–Wisconsin stock.

■■■ 18. Evenson has also failed to establish another necessary ingredient of the securities fraud claim: damage. There is nothing to suggest that the $10,000 purchase price of Evenson's CNC–Wisconsin stock was somehow skewed by the alleged nondisclosure (see the discussion of "loss causation" in the securities law context in *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–86 (7th Cir.1990); see also this Court's discussion in *W.A. Taylor & Co. v. Griswold & Bateman Warehouse Co.*, 742 F.Supp. 1398, 1405 n. 10 (N.D.Ill. 1990)) or that the later resale of the stock to Steker for $13,000 was problematic as a matter of securities law.

### Hopkins–Cote Personal Liability

19. For reasons stated in earlier Findings and Conclusions, this Court has rejected each of Evenson's tort-based claims against CNC–Wisconsin [23] while upholding the breach of contract claims by CNC–Illinois (and hence by Evenson as its successor). Yet all the Findings and Conclusions have consistently spoken of liability as extending to Hopkins and Cote individually as well as to CNC–Wisconsin (the latter is presumably an empty barrel that would

yield nothing if sought to be tapped) and to PMA (which is in Chapter 11 proceedings). In the next-stated Conclusions, the legal reasons for that personal liability will be set out with more particularity.

■■■ 20. Hopkins and Cote clearly *caused* CNC–Wisconsin (again more accurately PMA) to breach CNC–Wisconsin's contracts (the Asset Purchase Agreement and Evenson's Employment Agreement) in all the respects identified in the Findings and Conclusions. True enough, that alone might not be enough under Illinois law for the imposition of personal liability on Hopkins and Cote. Here is how our Court of Appeals described this forum's substantive law in that regard in *George A. Fuller Co. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1333 (7th Cir.1983) (citations omitted, emphasis in original):

> Illinois law requires—to state a cause of action against corporate officers for interfering with their corporate principal's contract—the allegation of facts which, if true, establish that the officers induced the breach to further their personal goals or to injure the other party to the contract, *and* acted contrary to the best interest of the corporation.

And even though the first of those components is clearly satisfied here, that formulation might leave open to dispute the second question—whether the wrongful inducement of the corporate breaches of contract was "contrary to the best interest of the corporation"—although it certainly enabled Hopkins and Cote to line their own pockets. But any such possible doubts about *Illinois* law are entirely beside the point, because Hopkins and Cote chose to form a *Wisconsin* corporation and to act as

linois (and hence Evenson) in its (and hence his) capacity as the seller of assets that had not yet been fully paid for and were therefore represented by notes receivable. But that analysis does not extend to the stock acquisition.

**22.** These Findings and Conclusions have already held that the termination of Evenson's Employment Agreement was wrongful. However, there is no question that the events leading to that termination took place after the acquisition of the CNC–Illinois asset and that the termination was *not* a preplanned matter on the part of

Hopkins and Cote. And there is equally no doubt that the takeout of Evenson as a CNC–Wisconsin shareholder was linked to the termination of his employment.

**23.** For this purpose Evenson's civil RICO claim, though strictly speaking a statutory cause of action, may be considered as effectively tort-based (with the claimed predicate acts of mail fraud and wire fraud constituting the tortious conduct).

its officers and directors. And Wisconsin law (which therefore controls here) specifically makes corporate directors and officers personally liable under the circumstances that this Court has found to exist. *Lorenz v. Dreske,* 62 Wis.2d 273, 287, 214 N.W.2d 753, 760 (1974) teaches that the conditional privilege of such corporate persons to cause the breach of corporate contracts is *destroyed* by what that case termed "wrongful motive" or "improper motive"—and *Lorenz* held that standard was satisfied by a complaint that charged that the corporate directors had diverted funds to themselves so that the corporation was unable to meet its obligations to the plaintiff. That describes what happened here to a T, and Hopkins and Cote are therefore jointly and severally liable with CNC–Wisconsin and PMA for the corporate breaches of contract.

■ 21. That identical destination of Hopkins' and Cote's individual liability is also pointed to inexorably via a different route—one equally well-charted and equally available here: "piercing the corporate veil" of CNC–Wisconsin and PMA. Any Wisconsin corporation—like any corporation formed in most if not all other American jurisdictions—is subject to the doctrine articulated in *Spearing v. County of Bayfield,* 133 Wis.2d 165, 173, 394 N.W.2d 761, 765 (Ct.App.1986) (citations omitted):

> This doctrine ["piercing the corporate veil"] is traditionally used as an exception to the rule that a corporation is a separate "entity" or "person" where application of the corporate fiction would operate as a fraud or defeat some strong equitable claim.

More recently the Wisconsin Supreme Court has elaborated on the doctrine at length in *Consumer's Co-op. of Walworth County v. Olsen,* 142 Wis.2d 465, 419 N.W.2d 211 (1988). Indeed, the present situation contrasts dramatically with that under which the "piercing" doctrine was found inapplicable in *Consumer's Co-op.:*

(a) Although the Findings and Conclusions here have determined (1) that there was insufficient proof of fraudulent representations made on CNC–Wisconsin's behalf *in the inception* of its acquisition from CNC–Illinois and (2) that Evenson did not *act* in reliance on any of the later fraudulent representations to his detriment, there was plenty of fraud by Hopkins and Cote to go around in their post-acquisition *conduct* of the PMA business—by engaging in imaginative and misleading financial recordkeeping, by disregarding the corporate structure in numerous respects, by using clearly improper reasons to declare purported contract defaults by CNC–Illinois and Evenson, by purporting to rescind the Asset Purchase Agreement when they very well knew that rescission could not be implemented—all the while lining their own pockets with large salaries that the corporation could not support.[24] And the *result* of that misconduct by Hopkins and Cote was damage to Evenson— which fits the *Spearing* formulation precisely.

(b) *Consumer's Co-op.* "agree[d] that inadequate capitalization may be a factor relevant to whether an injustice is present sufficient to justify piercing the corporate veil in a contract case" (*id.* at 481, 419 N.W.2d at 216), then went on to say (*id.* at 482, 419 N.W.2d at 217) (footnote omitted):

> While significant, undercapitalization is not an independently sufficient ground to pierce the corporate veil. In order for the corporate veil to be pierced, in addition to undercapitalization, additional evidence of failure to follow corporate formalities or other evidence of pervasive control must be shown.

---

**24.** In direct contrast, the trial court in *Consumer's Co-op.* "expressly found no fraud to have been involved in the transaction at bar" (142 Wis.2d at 473, 419 N.W.2d at 213). And the Wisconsin Supreme Court there made a point of mentioning the relevance (though not the necessity) for purposes of corporate-veil-piercing of the existence of "additional proof of fraud or constructive fraud" (*id.* at 480, 419 N.W.2d at 216)—ingredients that were present in ample supply here but were wholly absent in *Consumer's Co-op.*

Even though the Wisconsin Supreme Court then "agree[d] that '[t]he adequacy of capital is to be measured as of the time of formation of the corporation, [so that] a corporation that was adequately capitalized when formed but which subsequently suffers financial reverses is not undercapitalized'" (*id.* at 486, 419 N.W.2d at 218 (citations omitted)), it should again be emphasized that the situation in *Consumer's Co-op.* was not one in which—as is true here—the shareholders had continued to enrich themselves even while the corporate capital was being eroded and while payment to the corporate creditors (CNC–Illinois and Evenson) was being evaded by fancy footwork on the part of the shareholders.[25]

In sum, this case presents a classic example of the situation in which the "equitable remedy" of piercing the corporate veil (*id.* at 472, 419 N.W.2d at 213) is wholly appropriate—it is the archetype of the situation "where application of the corporate fiction would operate as a fraud or defeat some strong equitable claim" (*Spearing*, 133 Wis.2d at 173, 394 N.W.2d at 765), and it is therefore appropriate to invoke the doctrine of piercing the corporate veil.

 22. Still another road leads to personal liability on the part of Hopkins and Cote: the slightly different characterization known as the "alter ego" doctrine.[26] *Consumer's Co-op.*, 142 Wis.2d at 484, 419

N.W.2d at 217–18 (footnote omitted, quoting 1 Fletcher, *Cyclopedia of the Law of Private Corporations* § 43.10, at 490 (rev. ed. 1983)) described the kind of proof that is required under that doctrine to impose personal liability on shareholders for debts of their corporation:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Once more it would be difficult to conceive a more accurate description of the situation here. Thus there is still a third legal basis for the entry of judgment against Hopkins and Cote individually.

\* \* \*

 These Findings and Conclusions have resolved all the substantive claims on both sides of this litigation.[27] Just two

---

**25.** Again in direct contrast, in *Consumer's Co-op.* there was "ample evidence that substantial personal assets were used to *subsidize* the operation of the corporation in the form of unprofitable leasing agreements and foregone [sic—should be 'forgone'] salaries and rent" (*id.* at 472, 419 N.W.2d at 213). In other words, that case involved substantial post-formation efforts to shore up the corporation's financial condition at the shareholders' own expense, whereas Hopkins and Cote focused on their own personal gain at the expense of the corporation and its creditors.

**26.** As the ensuing brief discussion reflects, "alter ego" is pretty much another way of expressing the same notion as "piercing the corporate veil." To pursue the road metaphor, one of those legal concepts might be viewed as the alternate expressway to the other, just as Interstate 294 in the Chicago area and Interstate 894 in the Milwaukee area may be less congested highways to some destinations than taking I–94 all the way.

**27.** That is not precisely accurate. Count VIII of Evenson's Third–Party Complaint asserts lawyer malpractice on the part of the individual and the law firm who represented CNC–Illinois in the sale of assets to CNC–Wisconsin. Because no diversity of citizenship exists as to those third-party defendants (who, like Evenson, are Illinois citizens), the claim can be made here only on theories of pendent or ancillary jurisdiction. Even apart from the questionable viability of any such notions as to that claim in this litigation, the jurisprudential considerations identified by *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966) would counsel dismissal of that claim now in light of the disposition that has been made of all other claims in these Findings and Conclusions—and such dismissal of Count VIII would confer finality and enforceability on what is being done here without any need to refer to the considerations that are applicable to Rule 54(b) determinations. Con-

# 1450

issues stand in the way of quantifying the judgment in Evenson's favor: interest and attorneys' fees and expenses. Although any lack of final resolution of the amount of such fees and expenses (whether recoverable under contract or under a fee-shifting statute) does not derogate from the finality of the substantive judgment on the merits (*Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)), the same cannot be said as to the prejudgment interest element to be included in the judgment itself.

Accordingly Evenson's counsel is ordered on or before January 11, 1991 to file [28] a calculation of the interest component through January 25, 1991 of each element entering into Evenson's recovery under these Findings and Conclusions. On or before January 18 opposing counsel shall file a statement as to whether or not he agrees with the calculation by Evenson's counsel and, if not, as to the basis for his different calculation. This Court will then order the entry of judgment (including the interest component) on the January 25 date.

As for attorneys' fees, on or before the same January 11 date Evenson's counsel is ordered to file a request for an award of such fees. Counsel for the parties are directed to confer informally so that on or before January 24 counsel for Hopkins and Cote can file a statement as to whether or not he agrees with the calculation by Evenson's counsel and, if not, as to what issues (if any) will require an evidentiary hearing. Counsel for both parties are directed to keep in mind that litigation over fees (the issue of fees on fees) tends to be both wasteful and expensive.

sequently the judgment order contemplated here will include a dismissal of that claim without prejudice unless any party advances a persuasive reason for doing otherwise. Finally, as to Mergers, the only claims that were asserted against it (which did not include the breach-of-

contract claims) have not survived analysis, and it will be dismissed as a defendant.

28. All filings called for here shall be made in this Court's chambers rather than the Clerk's Office, to make certain that this Court has the opportunity to review them immediately.