**Rob KOLSON, et al., Plaintiffs,**

v.

**Rajan V. VEMBU, et al., Defendants.**

**No. 93 C 5360.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 28, 1994.

Decision Supplementing Opinion
Nov. 30, 1994.

Glenn E. Heilizer, Laterza & Heilizer, Chicago, IL, for plaintiffs.

Frederick H. Crystal, Michael Steven Sherman, Jeffrey L. Warnick, William Gerard Lacy, Crystal, Heytow and Warnick, P.C., Chicago, IL, Axley Brynelson, Larry K.

Libman, Michael J. Modl, Madison, WI, for defendants.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, Senior District Judge.

Rob Kolson ("Kolson") and Eric ("Eric") and Irwin ("Irwin") Weinstein (collectively "Weinsteins") have sued Rajan Vembu ("Vembu") and Robex USA, Ltd. ("Robex"), charging that Vembu fraudulently induced Kolson and Weinsteins to lend $150,000 to Sylvester Whey Products, Inc. ("Sylvester Whey") in violation of Illinois law. Kolson and Weinsteins also assert that Robex breached its obligations under several guaranties when Robex failed to repay the $150,000 (plus interest) upon default by Sylvester Whey. Finally, they contend that Vembu is personally liable for the entire sum guaranteed by Robex either under a common-law theory allowing such creditors to "pierce the corporate veil" or under the Illinois Business Corporation Act, 805 ILCS 5/8.65 and 5/9.10.

Kolson and Weinsteins have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 on their breach-of-contract claim against Robex and their derivative claim against Vembu. In turn Vembu and Robex have moved for summary judgment under Rule 56, arguing that the fraudulent inducement claim is time-barred under the applicable Illinois statute of limitations. For the reasons stated in this memorandum opinion and order, the Kolson–Weinsteins motion is granted while the Vembu–Robex motion is denied.

### Summary Judgment Principles

Familiar Rule 56 principles impose on each movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to each nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

This District Court's General Rule ("GR") 12(M) and 12(N) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Because the summary judgment motions in this case were filed concurrently, each side has complied generally with those rules by filing a GR 12(M) statement (respectively cited "P. 12(m) ¶—" and "D. 12(m) ¶—") and a GR 12(N) response (respectively cited "P. 12(n) ¶—" and "D. 12(n) ¶—").[1] Facts asserted and adequately supported by each moving party will be credited in this opinion unless controverted by the opposing party (*Stewart v. McGinnis,* 5 F.3d 1031, 1034 (7th Cir.1993)).[2]

### Facts [3]

Kolson, Irwin and Eric are respectively citizens of Illinois, Florida and New York (P. 12(m) ¶ 1). Kolson first became involved with Wisconsin citizen Vembu (*id.* ¶ 2) in 1986, when the latter approached Harris Bank of Chicago for $7.5 million in financing (Kolson Aff. ¶ 3). Vembu wanted the funds to build a manufacturing facility for Sylvester Whey, a company to be formed by him to process milk whey into lactose powder and protein powder (P. 12(m) ¶ 7; Kolson Aff. ¶ 3). Harris Bank employee Kolson agreed to seek the requested financing and also to

1. Though Vembu and Robex have filed a document captioned "Response to Plaintiffs' 12(n) Statement of Material Facts," that submission is clearly a response to the Kolson–Weinsteins GR 12(M) submission instead.

2. Vembu and Robex have technically failed to comply with the language of GR 12(N), which specifically requires a response to "each numbered paragraph in the moving party's statement." It appears, however, that Vembu and Robex have referred only to those paragraphs in P. 12(m) with which they disagree. All other statements in P. 12(m) that are not referred to by Vembu and Robex will therefore be deemed admitted. In any event, where P. 12(n) or D. 12(n) either explicitly or implicitly admits an assertion in the opposing D. 12(m) or P. 12(m), only the GR 12(M) statements will be cited.

3. This section presents enough of the factual background to facilitate an understanding of the legal analysis that follows. Added facts will be included as needed in the later sections of this opinion.

try to locate investors who would supply an additional $150,000 (Kolson Aff. ¶ 4).

In an effort to secure the extra $150,000 requested by Vembu, Kolson communicated with Weinsteins, who are his cousins (Kolson Aff. ¶ 5). Between August 1986 and May 1987 Kolson and Weinsteins loaned $150,000 to Sylvester Whey in five installments (P. 12(m) ¶¶ 7, 8). Though there is some dispute about the amount of Kolson's contribution, all parties agree that Kolson provided some portion of the financing (*id.* ¶ 12); Vembu Dep. 4). Sylvester Whey executed a promissory note for each installment (P. 12(m) ¶ 8 and Ex. B).

Although Vembu negotiated the $250,000 loan on behalf of Sylvester Whey (P. 12(m) ¶ 8), at Vembu's direction Kolson and Weinsteins made all five installment payments to Robex, another of Vembu's companies (*id.* ¶ 10). In return, Vembu arranged for Robex to issue five guaranties—one covering each installment—pledging repayment of all amounts due under the Sylvester Whey notes (*id.* ¶ 11). Vembu does not dispute Robex' issuance of all five installment guaranties (Vembu Dep. 4), but he claims an oral agreement with Kolson under which the guaranties were to be effective only until construction of the Sylvester Whey plant was completed (P. 12(n)(1) ¶ 11).

Vembu had formed Robex as a sole proprietorship in 1981 and later (in 1984) incorporated the company. Its purpose is to develop and promote aerobic and anaerobic technologies to convert waste into usable resources (P. 12(m) ¶ 16). From 1984 to the present Vembu has been Robex' sole shareholder, director, president and treasurer (*id.* ¶ 23), with others having held the offices of vice-president and secretary until 1993 (*id.* ¶ 24). Since 1993, however, Vembu has been the only corporate officer (*id.* ¶ 23). Robex has never had any other employees (*id.* ¶ 25). According to Vembu, Robex was to take credit for developing the Sylvester Whey project so that the company might later secure other projects (Vembu Dep. 138).

As the notes came due the parties agreed to a series of extensions, ultimately extending the maturity dates until December 15, 1989 (P. 12(m) ¶ 14 and Ex. B). When Sylvester Whey later announced that it was unable to pay any portion of the notes, Kolson and Weinsteins refused to provide further extensions and Sylvester Whey filed for Chapter 11 bankruptcy (*id.* ¶ 14). Kolson and Weinsteins then turned to Robex to recover their funds under the guaranties, but they learned from Vembu that Robex was also unable to pay any portion of the $150,000 (*id.* ¶ 15).

### Breach of Contract

Amended Complaint ("AC") Count II alleges that Robex breached its contract with Kolson and Weinsteins when it failed to honor its guaranties of the Sylvester Whey notes. In response Vembu and Robex argue that the language of the guaranties as to the waiver of defenses is ambiguous and that they are not precluded from arguing the guaranties' invalidity. They further claim that Kolson orally promised, but failed to include a provision in the guaranties, to terminate Robex' obligations upon completion of the Sylvester Whey plant. In light of the guaranties' clear language and given Vembu's review of the documents at the time of their execution (albeit it was concededly cursory in nature), this Court concludes that the guaranties must stand. But before this opinion turns to that analysis, two preliminary issues must be addressed briefly.

First, Kolson and Weinsteins have produced only the first and third guaranties totalling $105,000 (P. 12(m) Ex. C), but they claim the enforceability of the entire $150,000 in guaranties. For his part Vembu admits that Robex guaranteed the entire $150,000 in notes (Vembu Dep. 4), and he and Robex do not contend that the other three guaranty documents are any different from the two in the record. In light of the identical nature of those two guaranties and the total absence of any facts from which this Court might reasonably infer that the three remaining guaranties differ from them in any respect,[4] this

---

**4.** All of the documents were prepared by the Rudnick & Wolfe law firm. Nothing suggests

any reason for a later departure from the original form of guaranty—and it will be noted that the

opinion will deal with the enforceability of all five guaranties.

■ Second, those guaranties refer only to Robex and Weinsteins (P. 12(m) Ex. D). From that fact Vembu and Robex contend that Kolson should be barred from any recovery. But it is plain from the record that Weinsteins signed the relevant documents both for themselves and as nominees for Kolson.[5] Kolson explained that his name was omitted from those documents due to his position at Harris Bank and his uncertainty about the rules governing investment in clients (P. 12(m) ¶ 13), but Kolson's oral agreement with Weinsteins is that he will be repaid his pro rata share if the notes are repaid (Kolson Aff. ¶ 8). And Vembu was well aware that Kolson had contributed funds to the project (*id.;* Vembu Dep. 4). Consequently this opinion will entertain Kolson's contractual claims along with Weinsteins'.

■ Now to the merits, as to which the parties implicitly agree that Illinois substantive law should control. Each of the promissory notes contains a choice-of-law clause to that effect,[6] and each side has chosen to argue Illinois law in its briefs. Where as here this Court's subject matter jurisdiction is unaffected (*National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.,* 779 F.2d 1281, 1285 (7th Cir.1985)) and

the parties' choice is not unreasonable (*Marriage of Adams,* 133 Ill.2d at 446, 141 Ill.Dec. at 452, 551 N.E.2d at 639 (1990)),[7] no dispute will be generated where the parties have not chosen to create one (*Wood v. Mid–Valley Inc.,* 942 F.2d 425, 426–27 (7th Cir.1991)).

■ Contractual meaning is ordinarily a question of law (*Conway Corp. v. Ahlemeyer,* 754 F.Supp. 596, 599 (N.D.Ill.1990)), as to which a court's primary objective is to ascertain and give effect to the intent of the parties (*id.*). In *FIMSA, Inc. v. Unicorp Fin. Corp.,* 759 F.Supp. 1297, 1300 (N.D.Ill. 1991), this Court examined and quoted from Illinois case law under which guaranties are treated as contracts, legally enforceable in accordance with their express provisions:

> A guaranty must be construed as any other contract to determine the intent of the parties. Where the language is not ambiguous, it must be construed according to its terms.

\* \* \* \* \* \*

The rules of construction applicable to contracts generally also apply to contracts of guaranty, and if such a contract is unambiguous, it must be enforced as written. A guaranty contract which is unequivocal in its terms must be interpreted according to the language used, for it is presumed that

---

record does not contain successive guaranties, but rather the *first* and *third* (again buttressing the only reasonable inference that all of them were identical in content).

**5.** More than a half century ago *Schuh Trading Co. v. Comm'r,* 95 F.2d 404, 411 (7th Cir.1938) set out the still-applicable meaning of the term:

> The word nominee ordinarily indicates one designated to act for another as his representative in a rather limited sense. It is used sometimes to signify an agent or trustee. It has no connotation, however, other than that of acting for another, in representation of another, or as the grantee of another.

**6.** *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–98, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941) dictates recourse to Illinois choice of law rules in this diversity action. Under those rules the courts will honor the contracting parties' reasonable specification of the law applicable to their agreement (*In re Marriage of Adams,* 133 Ill.2d 437, 445–46, 141 Ill.Dec. 448, 451–52, 551 N.E.2d 635, 638–39 (1990)). Though no

language concerning choice of law or forum appears in the guaranties executed by Robex (P. 12(m) Ex. C), such provisions do appear in the promissory notes (P. 12(m) Ex. B). Those provisions state that Illinois law shall govern the validity, endorsement, interpretation, construction and effect of the notes alone. Robex guaranteed all obligations under the notes (P. 12(m) Ex. C) and hence essentially ratified the choice-of-law clause (*RTC v. Northpark Joint Venture,* 958 F.2d 1313, 1319 (5th Cir.1992)).

**7.** In the absence of agreement Illinois employs the "most significant contacts" rule to resolve choice-of-law issues in contract cases (*Purcell & Wardrope Chartered v. Hertz Corp.,* 175 Ill.App.3d 1069, 1079, 125 Ill.Dec. 585, 592, 530 N.E.2d 994, 1001 (1st Dist.1988)). Among the relevant factors are the residence of the parties and the place of negotiation (*id.*). Here Kolson is an Illinois resident, and Vembu approached Kolson at Harris Bank (also located in Illinois) to secure financing for his enterprise. In any event any choice-of-law issue is largely moot, given the lack of disparity between Illinois and Wisconsin contract law noted later in this opinion.

the parties meant what their language clearly imports.

In this instance there is surely no ambiguity in the guaranties' language (P. 12(m) Ex. C) (emphasis added):

> The obligations of the Guarantor shall not be affected, diminished, released, modified or impaired upon the happening from time to time of any event.
>
> \*　\*　\*　\*　\*　\*
>
> This Guaranty shall be construed as a continuing, absolute and unconditional guaranty of payment with regard to the validity, regularity, or enforceability of the Note *and without regard to any defense, set-off or counterclaim* which may at any time be available to or be asserted by the Maker against Weinstein, or by any other circumstance whatsoever (with or without notice to or knowledge of the Maker or Guarantor) *which constitutes, or might be construed to constitute,* an equitable or legal discharge of the Maker for the liabilities under the Note, or of the Guarantor under this Guaranty.

Thus Robex has expressly waived all defenses, set-offs and counterclaims. Illinois courts routinely enforce such waivers contained in guaranties (*FIMSA,* 759 F.Supp. at 1301).[8]

■ Next Robex seeks to introduce parol evidence that another portion of the guaranties' language does not accurately reflect the parties' agreement (P. 12(m) Ex. C):

> The obligations of the Guarantor under this guaranty are absolute, continuing, unconditional and irrevocable, and shall remain in full force and effect until all the liabilities of Maker under the Note have been indefeasibly paid and until payments of the liabilities of Maker under the Note are not subject to rescission or repayment under any bankruptcy, insolvency, reorga-

nization, receivership, arrangement or similar proceeding affecting the Maker.

But such unambiguous contractual language normally carries with it the conclusive presumption that all material terms and all prior negotiations have been merged into it (*A–Tech Computer Serv.,* 254 Ill.App.3d at 403, 193 Ill.Dec. at 869, 627 N.E.2d at 29). Thus such a written agreement complete on its face supersedes all prior agreements on the same subject and bars introduction of parol evidence as to those prior matters (*Magnus v. Lutheran Gen. Health Care Sys.,* 235 Ill. App.3d 173, 182, 176 Ill.Dec. at 209, 216, 601 N.E.2d 907, 914 (1st Dist.1992)).

■ There are however exceptions to that general bar of parol evidence. Those exceptions extend to proof of mutual mistake, conditional delivery, lack of consideration or fraud (*O'Brien v. Cacciatore,* 227 Ill.App.3d 836, 845, 169 Ill.Dec. 506, 512, 591 N.E.2d 1384, 1390 (1st Dist.1992)), including fraud in the inducement of the contract (*General Elec. Credit Auto Lease, Inc. v. Jankuski,* 177 Ill.App.3d 380, 386, 126 Ill.Dec. 676, 680, 532 N.E.2d 361, 365 (1st Dist.1988)).

■ That last type of claim requires proof of a statement of material fact known to be false by the maker and made with the purpose of inducing another party to act (*Seward v. B.O.C. Div. of General Motors Corp.,* 805 F.Supp. 623, 630 (N.D.Ill.1992)). In addition, the party claiming fraudulent inducement must reasonably believe and rely upon the statement to his, her or its detriment (*id.*). Once proved, fraudulent inducement is sufficient to invalidate the contract (*id.*).

Vembu contends that he told Kolson that Robex had no assets to guarantee the Sylvester Whey notes, but that Kolson nevertheless required the guaranties because Weinsteins "wanted some guarantee on that" (Vembu Dep. 223–24).[9] Vembu further says that he

---

8. Vembu and Robex argue that *FIMSA* stands for the proposition that the word "waiver" must appear in the clause in question for that clause to be enforceable. That is of course nonsense—in *FIMSA* itself (*id.*) this Court accurately described as an "express waiver" a clause that did not include the allegedly magic word. Instead the existence of a waiver depends on the meaning and purpose of the language used, the key to its

enforceability is the lack of ambiguity, and language appearing in a contract will not be found ambiguous simply because the parties disagree as to its meaning (*A–Tech Computer Serv., Inc. v. Wayne Soo Hoo,* 254 Ill.App.3d 392, 403, 193 Ill.Dec. 862, 869–70, 627 N.E.2d 21, 28–29 (1st Dist.1993)).

9. Of course it takes a good deal of straining to credit that version—why would Eric (who Vem-

agreed to the guaranty requirement because Kolson assured him that Robex would guarantee the notes only until the completion of the Sylvester Whey plant (*id.* 198–201). According to Vembu, that made sense because once it was capitalized Sylvester Whey would be in a far better position to cover the notes (*id.* 202), and the plant would be completed before the notes came due (*id.* 228–29). But Vembu acknowledged that the purported understanding was never reduced to writing (*id.* 199), and he said he discovered that omission for the first time when Kolson threatened to sue him personally (*id.* 201).

 Whether one party fraudulently induced another party to enter into an agreement has generally been considered a jury question (*Sexton v. Southwestern Auto Racing Ass'n, Inc.*, 75 Ill.App.3d 338, 340, 31 Ill.Dec. 133, 134, 394 N.E.2d 49, 50 (5th Dist.1979)). But Illinois courts have consistently refused to extend the doctrine of fraudulent inducement to vitiate contracts where the complaining party could have discovered the fraud by reading the instrument and had the opportunity to do so (see, e.g., *Dickinson v. Dickinson*, 305 Ill. 521, 527–28, 137 N.E. 468, 470–71 (1922); *Belleville Nat'l Bank v. Rose*, 119 Ill.App.3d 56, 59–61, 74 Ill.Dec. 779, 782–83, 456 N.E.2d 281, 284–85 (5th Dist.1983); *Hurley v. Frontier Ford Motors, Inc.*, 12 Ill.App.3d 905, 911, 299 N.E.2d 387, 392 (2d Dist.1973); and cases cited in each of those decisions). In such cases any reliance upon the claimed misrepresentation has been held to be unreasonable as a matter of law, so that the contract stands as written.

This case comes squarely within the due diligence rule of all of those cases (see *Belleville Nat'l Bank*, 119 Ill.App.3d at 60–61, 74 Ill.Dec. at 782, 456 N.E.2d at 284). Vembu fully recognized that Robex was guaranteeing the Sylvester Whey notes (Vembu Dep. 225). Though he said that he trusted Kolson and "felt that [the condition] would be there"

(*id.* 202), he had more than ample opportunity to read the contracts before signing them—indeed, they were sent to him for execution (*id.* 217). In fact Vembu testified that he *did* read the documents, but he offers the lame (and unacceptable) excuse that he forgot to check for the alleged condition because there were a lot of other things to which he was paying attention (*id.* 218).

Robex' guaranties are not complicated—each is 1–1/2 typewritten pages in length, and the language as to duration of the undertaking appears in the sentences immediately following the recitations of the guaranty amounts, one of which was filled in by hand (P. 12(m) Ex. C). More specifically, the language extending Robex' liability on the notes until the "Maker" (Sylvester Whey) fulfills its obligations in full is perfectly straightforward, and the *omission* of any mention of earlier termination upon completion of the Sylvester Whey plant is glaringly obvious (*id.*). To render Vembu's contention even less tenable (if possible), it will be recalled that he signed the identical document on the two known occasions of January 5, 1986 and August 14, 1986, and all reasonable inferences (as already stated) tell us that he did the same in connection with the other three notes (as to the significance of such repeated failures to read documents, see *Belleville Nat'l Bank*, 119 Ill.App.3d at 61, 74 Ill.Dec. at 783, 456 N.E.2d at 285).[10]

In candor, the feeble nature of the Vembu–Robex arguments strongly suggests that they represent an after-the-fact attempt to escape the impact of the unequivocal and unambiguous guaranty language—an attempt that would take advantage of the rule against weighing credibility on a Rule 56 motion. But that rule does not aid Vembu and Robex here, for Vembu's claim that he was misled into signing the guaranties, even when his version is credited, fails in light of his inexcusable failure to learn the contents of the documents before signing. Hence the Robex guaranties are enforceable as written,

---

bu and Robex emphasize is knowledgeable and sophisticated) want a meaningless guaranty, and why would the knowledgeable and sophisticated Kolson ask for it? However, this opinion does not rest at all on Vembu's credibility or lack of credibility.

10. Vembu also argues that his lack of legal representation left him without protection. But any such contention wholly ignores his duty to learn the contents of the writings if he did not understand them (see *id.*, 119 Ill.App.3d at 59, 74 Ill.Dec. at 782, 456 N.E.2d at 284).

and Kolson and Weinsteins prevail on that issue as a matter of law.[11]

### Piercing the Corporate Veil

■ What has been said to this point might well have no practical effect in light of the fact that Robex cannot now (and, Vembu claims, never could) cover the $150,000 to honor the guaranties (Vembu Dep. 207). Hence Kolson and Weinsteins urge that despite Robex' corporate existence Vembu should be held personally liable for the entire amount due and owing. Vembu retorts that Robex complied with all applicable laws and operated as a distinct entity, so that its corporate form should insulate Vembu from such exposure. But because Vembu has failed to create a genuine issue of material fact in that respect, again Kolson and Weinsteins prevail as a matter of law, and Vembu is personally liable on the Robex guaranties.

■ As an initial matter, the choice of law question must be revisited.[12] Kolson and Weinsteins cite Illinois law without arguing why it should apply, while Vembu and Robex invoke this Court's opinion in *CNC Serv. Ctr., Inc. v. CNC Serv. Ctr., Inc.*, 753 F.Supp. 1427, 1447–48 (N.D.Ill.1991) for the proposition that Wisconsin law should apply because Robex is a Wisconsin corporation with its principal place of business in Wisconsin and Wisconsin citizen Vembu is its sole shareholder, director, president and treasurer.

In applying the law of the state of incorporation to determine issues of corporate identity, *CNC Serv. Ctr.* adhered to long-standing tradition (see Phillip Blumberg, *The Law of Corporate Groups: Tort, Contract, and Other Common Law Problems in the Substantive Law of Parent and Subsidiary Corpora-*

tions § 26.02, at 616–17 (1987); Restatement (Second) of Conflict of Laws §§ 302(2), 309 (1971)). In like fashion our Court of Appeals has recently followed the same approach, reviewing Connecticut law to ascertain whether a Connecticut corporation's veil should be pierced (*Mark I, Inc. v. Gruber*, 38 F.3d 369, 371 (7th Cir.)).

To be sure, such recourse to the place of incorporation is not simply a matter of slavish adherence. For example, *Hystro Prod., Inc. v. MNP Corp.*, 18 F.3d 1384, 1387 (7th Cir.1994) teaches that the laws of a foreign state of incorporation will not necessarily govern issues of corporate identity where the most significant contacts of the corporation (in that instance the place of negotiation and performance of the contract at issue) were in Illinois (see also *Secon Serv. Sys. Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 412–13 (7th Cir.1988)).

That possibility need not be considered here, where all arrows point to the application of Wisconsin law. Both Sylvester Whey and Robex were Wisconsin corporation, each with its principal place of business in Wisconsin (P. 12(m) Ex. B; D. 12(n) Ex. A). As already stated several times, Vembu (the principal of both corporations) is a Wisconsin citizen (P. 12(m) ¶ 2). Though Kolson was approached in Illinois, the purpose was to obtain financing for the Sylvester Whey plant in Wisconsin (Kolson Aff. ¶ 3; D. 12(n)(2) ¶ 4).

There is thus no reason to depart from the traditional rule. Hence this opinion will look to the laws of Wisconsin, the state of Robex' incorporation.

■ Wisconsin courts are perfectly willing to pierce the corporate veil[13] to en-

---

11. Even were Wisconsin law to apply to the breach-of-contract claim, the result would be the same. Because this opinion has already explained the clear applicability of Illinois law, all that will be done here is to set out the Wisconsin cases supporting all of the propositions that have been discussed in the text, in much the same sequence: *Harris v. Metropolitan Mall*, 112 Wis.2d 487, 334 N.W.2d 519, 527 (1983); *Sprangers v. Greatway Ins. Co.*, 182 Wis.2d 521, 514 N.W.2d 1, 7 (1994); *St. Norbert College Foundation, Inc. v. McCormick*, 81 Wis.2d 423, 260 N.W.2d 776, 780 (1978); *Caulfield v. Caulfield*, 183 Wis.2d 83, 515 N.W.2d 278, 282–83 (App.

1994); *Richards v. Richards*, 181 Wis.2d 1007, 513 N.W.2d 118, 122 (1994); *State Farm Fire & Casualty Co. v. Home Ins. Co.*, 88 Wis.2d 124, 276 N.W.2d 349, 351 (App.1979).

12. *In re Air Crash Disaster Near Chicago*, 644 F.2d 594, 611 & nn. 14–15 (7th Cir.1981) teaches the principle of depecage: an issue-by-issue approach on choice-of-law issues.

13. To the extent that there is an "alter ego" doctrine independent of veil piercing theories (*Mark I*, 38 F.3d at 371), *CNC Serv. Ctr.*, 753

force contracts where equity so requires. Citing what it called a "standard approach," *In re Kaiser,* 791 F.2d 73, 75 (7th Cir.1986) (citing cases) has observed:

> Wisconsin courts have eschewed legalisms and allowed the corporate veil to be pierced, and the shareholder held personally liable, whenever limited liability would "defeat some strong equitable claim."

For that purpose *Consumer's Co–Op v. Olsen,* 142 Wis.2d 465, 419 N.W.2d 211, 214 (1988) has reconfirmed the controlling standard identified in earlier case law:

> [T]he existence of the corporation as an entity apart from the natural persons comprising it will be disregarded, if corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice.

*Consumer's Co–Op, id.* 419 N.W.2d at 214–15 also reviewed several relevant factors under that test, including a lack of serious attempts to hold corporate meetings or to maintain records, a lack of substantial assets, commingling of private and corporate funds and obviously inadequate capitalization.

Robex adhered no more than minimally to corporate formalities. It was incorporated in Wisconsin on September 17, 1984 (D. 12(n) Ex. A). At least nominally, it was on the same date [14] that Vembu authenticated the corporate minute book, adopted an extensive set of corporate by-laws, designated First Wisconsin National Bank as its depository and issued a depository note for $10,000 to Vembu (P. 12(m) Ex. G). Vembu elected

himself President and Treasurer and elected Bruce Harms Vice–President and Secretary (*id.*). Vembu also adopted resolutions on such matters as insurance for employees, the form of certificates for shares, payment of business expenses and physical examinations of corporate officers (*id.*). Robex' Articles of Incorporation authorized 56,000 shares of $1 par value common stock, with Vembu subscribing to 1,000 shares for $5,000 (*id.*).

No actual shareholders' or directors' meetings are reflected in Robex' minute book. Instead it contains numerous "Action by Shareholder and Director by Unanimous Consent" forms appointing Vembu as sole director and naming corporate officers for successive periods (documents dated in October of each year from 1985 through 1990, then in January of 1991 and 1992 (P. 12(m) Ex. G). Other "Unanimous Consent" forms change the corporate depository, remove Bruce Harms from the office of Vice–President and Secretary and install Russell Cichy in his place (*id.*).

But the related evidence showed that those documents, even if regularly prepared, reflected mere form more than reality. By-law provisions specifying reimbursement caps of $65 per day were later ignored (Vembu Dep. 119). Robex' bylaws also required that detailed records be kept for purposes of reimbursement (P. 12(m) Ex. G at 40–41), but Vembu failed to keep such records (Vembu Dep. 115–16) even though such payments were made as early as 1984 (P. 12(m) Ex. AA). Similarly, although the bylaws also provided for the establishment of executive compensation (P. 12(m) Ex. G at 7), Vembu stated that Robex never hired any employees

---

F.Supp. at 1449 n. 26 has noted that those theories might be viewed as alternate expressions of the same notion.

**14.** Plaintiffs Kolson and Weinsteins challenge the date on which the documents were signed. They attach the invoice of Vembu's attorney to show that the lawyers did not review and amend the by-laws, resolutions and "corporate documentation" until August 1985 (P. 12(m) Ex. H) and that there has been no indication of the rendition of such services on a regular basis after that.

Though counsel for Vembu and Robex poohpoohs the suggestion that many of the successive years' documents were prepared simultaneously rather than when they were purportedly dated, it must be said that the internal evidence of those documents (such as spacing, punctuation and other identical aspects) strongly suggests that Kolson and Weinsteins are right in offering that point. But again this opinion does not digress to resolve that issue—it ascribes no weight whatever to the suggestion, for it is unnecessary to the decision here.

and never paid any compensation to its officers or directors (Vembu Dep. 108–09).[15]

Those things, however, cannot resolve the corporate-veil inquiry (particularly given the need to draw inferences favorable to Vembu). Instead other uncontroverted aspects of the record make it clear that Robex' corporate structure must be pierced. For example, a telling example of commingling of funds involves the $300,000 developer's fee received from Kleinwort Benson between 1988 and 1989. Two payments designated "developer's fees" and totalling $128,580 were made to "Robex, U.S.A., Ltd." (P. 12(m) Ex. K), but then Vembu redirected the $128,580 into his own pocket (Vembu Dep. 187). Vembu effectively torpedoes his own present argument as to Robex' independent existence for present purposes (Vembu Dep. 187–88):

Q. Robex was the developer of the SWPI project, correct?

A. We referred to it as the developer, yes.

Q. A developer's fee of $300,000 was paid to Robex by Kleinwort Benson, correct?

A. It was paid to me.

Q. It was paid to you personally?

A. Yes.

Q. All $300,000?

A. All $300,000, I was entitled to get that as a fee.[16]

Q. So you took the $300,000 as a fee, not Robex?

A. Some check was written to Robex. And I don't remember exactly how much.

Q. But you reimbursed yourself?

A. Yes.

Q. So ultimately you got the benefit of the $300,000. It was something that you earned and you got it, correct?

A. Yes.

Q. Personally?

A. Yes.

Q. Why is it your contention that the money should not have been paid to Robex as a developer of the project?

A. I was not an employee of Robex.[17] I was not compensated for my time that went into the Robex, into the project. And Robex is something that I tried to promote as a company. We wanted Robex to be recognized as the developer of the project so that Robex would get the credibility to get the contract from Sylvester Whey and go on and develop other projects.

Vembu later confirmed that he viewed himself and not Robex as the one primarily responsible for the development of the Sylvester Whey project (*id.* 193–94):

Q. What was it that you did, whether it's hours spent or a service provided, that earned you the $300,000, what was that for?

A. For—I am the one who put Sylvester Whey project together. And I have spent countless hours doing that.

Q. Every shred of every document that's been produced in this case suggests to me that Robex USA, Limited is the entity that put this project together and that you ran Robex USA, Limited. Is that a fair statement?

A. I don't know how many documentation are out there indicating Robex USA, Limited did that. But I was promoting Robex USA, Limited as well as Sylvester Whey Products. But the compensation to me came from Sylvester Whey products.

---

**15.** When Vembu was shown two check stubs from Robex in his own handwriting designating payments of $2500 and $1500 to Vembu as "salary" (Vembu Dep. 176–182; P. 12(m) Ex. N), Vembu responded simply that the word "salary" occurring on the stubs was a "misnomer, miswriting" (Vembu Dep. 181). Like all of the other bits and pieces in the record, what is reflected is a blithe disregard of both the formalities and the substance of corporate existence.

**16.** [Footnote by this Court] Apart from the $125,580 already mentioned in the text, other payments were made to Vembu directly and also to Kolson's mother (P. 12(m) Ex. K). Some of those payments were consented to by Kolson as Sylvester Whey's President (D. 12(n) Ex. R at 4).

**17.** [Footnote by this Court] That puts the lie to Vembu's claim, in his eighth affirmative defense, that he "was acting solely within the scope of his corporate authority as an officer with ROBEX, U.S.A., LTD." (Amended Answer ¶ 20).

It cannot be gainsaid that Vembu acted as though Robex' funds were his own. For example, Vembu pledged at least one (and almost certainly two) Robex certificates of deposit—clearly corporate assets—as collateral for a purely personal loan, the proceeds of which he used to purchase a home (Vembu Dep. 284–85; P. 12(m) Ex. P). Vembu also disregarded corporate integrity when he used Robex funds to pay the deposit and insurance on his personal car, a Saab (P. 12(m) Ex. R), though Vembu did not recall that transaction when questioned (Vembu Dep. 290–92). Vembu also made out two checks to the Wisconsin Academy of Adaptive Learning that he designated in his own handwriting as "tuition" for his two daughters (P. 12(m) Ex. Q) who were enrolled there, though he maintains that the payments were simply "donations" (Vembu Dep. 328; D. 12(n) Ex. S). Finally, Vembu could not explain why he had wired $15,052 from the Robex account to four individuals in India, stating only that the transmittal may have been related to the developer's fee having been paid to Robex instead of him personally (*id.* 326–27; P 12(m) Ex. U).

Robex' sole "viable" project was purportedly the development of the Sylvester Whey project (Vembu Dep. 136). Yet Vembu confirmed that Robex itself was never compensated for its development work (*id.* 140). Instead he said that it was thought that Robex would enter into an agreement with Sylvester Whey to do consulting work—though there would still be no compensation for the work done to get Sylvester Whey up and running in the first instance (*id.* 139, 140).

In a sense the issue as to Vembu's having played fast and loose with the $300,000 developer's fee—taking a substantial part of it by direct payments and a substantial part by treating Robex as a parking place or conduit before he drew down the funds personally—is as much a matter of how the money was handled as a matter of entitlement to the funds. After all, if Robex had *no* right to any money it was no more than an empty shell, while if it did have some right to the money Vembu had no business treating it as though it were another of his personal pock-

ets. Whatever view may be taken of the matter, what is plain is that Vembu totally ignored the corporate proprieties in favor of continuing the venture as the same loose sole proprietorship that he had run before he took the purely formal step of obtaining a corporate charter. And that type of disregard is really the hallmark of a piercing of the corporate veil.

Robex also never paid a single dollar in taxes. Though that itself is not at odds with its existence because it perpetually operated at a loss (*id.* 72, 76), Vembu's disregard of Robex' corporate existence is further confirmed by the fact that it simply stopped filing tax returns after 1987 because both Vembu and his Vice–President Russell Cichy were too "busy" (*id.* 92).

Still other evidence uniformly demonstrated that Robex had no meaningful existence apart from Vembu. Though there was a contract for office space under Robex' name, Sylvester Whey was the major user of the space and paid the rent (*id.* 62–63). At the time of Vembu's deposition Robex had no office in Vembu's home or otherwise (*id.* 56). Vembu testified that there were no papers, letters or notes being sent to potential customers with whom he met and left his calling card (*id.* 57). He closed Robex' only bank account at State Bank of Cross Plaines in either 1991 or 1992 (*id.* 59–60), and he testified that he must have paid Robex' single expense since that time (a $25 filing fee with the State of Wisconsin) with a personal check (*id.* 60–61). Vembu, by his own admission a scientist and not a bookkeeper (*id.* 174), acknowledged that there should have been a Robex check ledger for each bank with which it had dealt, but he did not have all of those ledgers and did not know where they were (*id.* 101–02, 149–50).

Another factor—the value of assets assertedly held by Robex—points in the same direction of disregarding Robex' corporate identity. Its sole assets throughout the entire course of its incorporation were an AT & T computer, two folding tables, a desk and associated chair plus four or five other chairs

(*id.* 61, 74).[18] Robex' entire documented capitalization came from Vembu's purchase of $5,000 in stock (*id.* 111–13). Though Vembu also referred to a $10,000 loan to Robex (*id.*), that would tend to confirm an overly thin corporate structure, if the known capital needs of the venture are taken into account as they must be for this type of analysis.

There is thus no question under Wisconsin law that Robex existed apart from Vembu in name only and that to insulate Vembu from liability would work a manifest injustice on Kolson and Weinsteins.[19] Though Robex complied facially with the purely rudimentary forms of incorporation, Vembu routinely commingled funds with Robex, used Robex funds for his personal use and diverted substantial sums of money away from Robex and into his personal accounts. All of the evidence calls for the piercing of Robex' corporate veil, rendering Vembu personally liable on the $150,000 in guaranties.[20]

### *Fraudulent Inducement*

While the just-announced determination that Vembu is personally liable for the $150,000 in Robex guaranties is fully dispositive of this action, in the interest of completeness this opinion will go on to deal with the Vembu–Robex cross-motion attacking the alternative claim of common-law fraud on time-bar grounds. Under the applicable law[21] this Court holds that a genuine issue of material fact would have remained as to the time of accrual of that claim of fraud, so as to render summary judgment on that issue inappropriate.

According to the AC, Vembu's fraudulent misrepresentations include lies as to his level of education in the areas of food and waste processing, his past professional experience in that same area, the amount of equity that he personally invested in Sylvester Whey and his intention to hire Kolson as a salaried employee. Vembu is also charged with having misled Kolson and Weinsteins into believing that Robex would continue to be actively involved in the Sylvester Whey project and would be able to honor the guaranties.

Though Vembu denies those misrepresentations in Amended Answer ¶ 12, the current motion for summary judgment is limited to the argument that the claim is barred by limitations. It is urged that any cause of action for the claimed fraud accrued when the very first loan document was signed in August 1986, because Kolson and Weinsteins failed to use "reasonable diligence" in seeking to learn facts that would have disclosed the alleged wrongs. If the information supplied by Vembu was material to their investment decision, Vembu argues that Kolson and Weinsteins should have done their homework then. Under the same line of reasoning, Vembu claims that the cause of action for fraud accrued at the latest in May 1987, when Weinsteins signed the last of the loan agreements.

---

**18.** Vembu could not explain the entries on Robex' tax returns for 1985, 1986, and 1987 successively listing its assets at the much higher figures of $52,996, $66,257 and $33,158 (*id.* 231–33).

**19.** Just as in the preceding section n. 11 showed the result under Wisconsin law would be no different from that dictated by Illinois law (which applied to that issue), so too the outcome on this issue would be the same if Illinois law rather than Wisconsin law had provided the rules of decision (see *Hystro Products*, 18 F.3d at 1388–89, 1391; *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 462–63 (7th Cir.1991)).

**20.** That conclusion renders it unnecessary to consider the alternative contention that Vembu might be personally liable for rendering Robex insolvent through distributions to himself under 805 ILCS 5/8.65(a)(1) and 5/9.10(c). But having said that, this Court is constrained to observe that it would seem bizarre to look to Illinois law rather than applying the normal internal affairs doctrine of corporate governance (see *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir.1990); *Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 377 (7th Cir.1984); 17 William Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 8429, at 484 (perm. ed. 1987)).

**21.** As with the breach-of-contract claim, the parties agree that Illinois law should apply to determine the fraud issue. Vembu and Robex cite Illinois law exclusively in their motion, while Kolson and Weinsteins respond in like vein because many of the claimed misrepresentations were made in Illinois. That mutually adopted approach is entirely reasonable, for in tort cases Illinois has adopted the "most significant relationship" test, under which the place of injury controls unless another state has a more significant relationship (*Miller v. Long–Airdox Co.*, 914 F.2d 976, 978 (7th Cir.1990)).

Analysis of those contentions implicates two related but distinct issues. As an initial matter, it must be determined if there is a genuine issue as to whether the asserted reliance on Vembu's claimed misrepresentations was justifiable in light of the surrounding circumstances (see *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 371 (7th Cir.1988)). If reliance was not justifiable as a matter of law, Kolson and Weinsteins cannot establish an essential element of fraud in the first instance (see *Weber v. DeKalb Corp.*, 265 Ill.App.3d 512, 202 Ill. Dec. 155, 637 N.E.2d 694, 697–98 (1st Dist. 1994)) and their claim fails altogether—the ultimate time-bar. If however such original reliance was not unjustifiable as a matter of law, the second issue must be examined: at what point in time a reasonable person would have been put on inquiry notice, triggering the accrual of a fraud-based cause of action.

*Justifiable Reliance*

▅▅▅▅▅▅ *Teamsters Local 282*, 839 F.2d at 371 teaches that in determining whether reliance upon a misrepresentation was justifiable, "the crucial question is whether the plaintiff's conduct was so unreasonable under the circumstances and 'in light of the information open to him, that the law may properly say that this loss is his own responsibility.'" For that purpose a court should examine both a party's actual knowledge and the knowledge the party might have derived in the exercise of ordinary prudence (*id.* at 370). As this Court had earlier noted in the same case (649 F.Supp. 1242, 1250 (N.D.Ill. 1986)), the concept of justifiable reliance is simply a specialized version of the concept of "inquiry notice," under which anyone having notice of facts that would put a prudent person on inquiry is chargeable with knowledge of other facts that could have been discovered through investigation.

Kolson and Eric clearly qualified as sophisticated investors. From 1977 to 1981 Kolson taught business economics to MBA candidates at the University of Chicago Graduate School of Business (Kolson Dep. 65–66)—one of the most prestigious business schools in the country—after having left the doctorate program there before completing his dissertation (*id.* 66). For his part, from 1985 to June 1990 Eric was employed by Manhattan Consulting Group, first as Senior Consultant, then as Vice–President (Eric Dep. 19–22). In those positions he counselled financial institutions on various matters, including strategy and capital structure (*id.* 20). Eric had been an economics major at Brandeis University, then received his MBA from the University of Pennsylvania's Wharton School of Commerce (*id.* 14–15). Finally, Irwin (a physician) was comfortable enough with his brother's business acumen to defer to him for all business decisions in this matter (*id.* 114) and to enter into a limited partnership with him in two warehouse facilities (*id.* 47).

Because it is undisputed that Kolson and Weinsteins relied almost entirely upon what was said in the private placement memorandum (the "Memorandum") [22] before investing in the Sylvester Whey project (AC ¶ 28; Kolson Dep. 189–90; Eric Dep. 60–67), the question becomes whether such sophisticated investors were justified in such reliance or rather should have been required as a matter of law to verify the information. It is undisputed that the information derived from Vembu and contained in the Memorandum was not verified.[23] In that respect Kolson

---

[22]. Although Kolson prepared the Memorandum (Kolson Dep. 41), he did so on the strength of the information supplied by Vembu.

[23]. This legend appeared on the first page of the Memorandum (D. 12(m) Ex. G) (emphasis added):

THE INFORMATION FURNISHED HEREIN HAS BEEN OBTAINED FROM THE BORROWER AND IS PROVIDED FOR THE EXPRESS PURPOSE OF EVALUATING THE PROPOSED FINANCING. IT IS NOT TO BE USED FOR ANY OTHER PURPOSE NOR MADE AVAILABLE TO ANYONE NOT DIRECTLY CONCERNED WITH THE DECISION REGARDING THIS FINANCING. *WE HAVE MADE NO INDEPENDENT INVESTIGATION OR VERIFICATION OF THIS INFORMATION, NOR DO WE GUARANTEE THAT THE FOREGOING IS A COMPLETE STATEMENT OF ALL MATERIAL FACTS.* THIS MEMORANDUM IS SUBJECT TO AMENDMENT OR OTHER CHANGE WITHOUT NOTICE. ANY PARTY NOT HAVING AN INTEREST IN THIS FINANCING IS REQUESTED TO RETURN THIS MEMORANDUM AS SOON AS POSSIBLE.

Kolson also confirmed during his deposition that in preparing the Memorandum he did not verify project costs (Kolson Dep. 46–47), equity contri-

testified that whether or not the preparer of a private placement memorandum is charged with verifying its data depends upon the deal (Kolson Dep. 44). In this instance Kolson repeatedly told Vembu that potential investors would eventually require verification of project costs (*id.* 46–47) and equity contributions (*id.* 48) and that lenders would do a background check on Vembu himself (*id.* 54). Kolson claims that it was partly to finance the preparation of additional documents that Vembu needed the $150,000 in the first instance (*id.* 126).

It cannot be said as a matter of law that the proverbial "prudent man" would have found it necessary to go behind the information appearing in the Memorandum. Vembu and Robex, pointing vaguely to the Memorandum as a whole, argue in favor of requiring verification. But the Memorandum is an extensive document containing 26 pages and five additional appendices presenting such detailed information as the Sylvester Whey project's background, projected financial information, descriptions of the relevant markets, information on developer Robex and background information on key personnel including Vembu (D. 12(m) Ex. G).[24] Rudnick & Wolfe, an experienced and reputable law firm, reviewed the Memorandum in August 1986, shortly before it handled the loan arrangements between Kolson and Weinsteins (D. 12(m) Ex. I).[25] Moreover, Vembu had produced to Kolson all documents that the latter had requested, including documents verifying Robex' incorporation papers (Kolson Dep. 43), insurance contracts (*id.*) and many hundreds of other documents (though it is unclear to what extent those documents were delivered before the completion of the Memorandum) (*id.* 46–47).

In short, there remains a genuine issue of material fact as to whether the reliance placed upon the information appearing in the Memorandum by Kolson and Weinsteins was justifiable. Nothing in the Memorandum would, as a matter of law, require a reader to verify Robex' financial viability, Vembu's equity contributions or Vembu's background.[26]

*Statute of Limitations*

That conclusion leads to the second stage of the analysis in this section. Vembu and Robex contend that even if Kolson and Weinsteins were originally justified in relying on the Memorandum, they became aware of the alleged misrepresentations early enough so that Illinois' five-year statute of limitations should bar their fraud claim. For many of the same reasons already discussed, the precise time at which the cause of action accrued could not now be decided as a matter of law.

Under Illinois law the 735 ILCS 5/13–205 five-year statute of limitations applies to common law fraud claims (see, e.g., *Melko v. Dionisio*, 219 Ill.App.3d 1048, 1058, 162 Ill.Dec. 623, 628, 580 N.E.2d 586, 591 (2d Dist.1991)). When a defendant raises a statute-of-limitations issue, the plaintiff must come forward with facts sufficient to avoid the statute's effect (*Hermitage Corp. v. Contractors Adjustment Co.*, 264 Ill.App.3d 989, 202 Ill.Dec. 465, 468, 637 N.E.2d 1201, 1204 (1st Dist.1994)). In other words, the plaintiff bears the burden of showing that the action was brought within the applicable period (*id.*). Alternatively the plaintiff may attempt to invoke the discovery-rule exception to the otherwise valid limitations period (*id.*).

*Knox College v. Celotex Corp.*, 88 Ill.2d 407, 414–16, 58 Ill.Dec. 725, 728–30, 430 N.E.2d 976, 979–81 (1981) explains that the

---

butions (*id.* 49), Vembu's background (*id.* 50) or the backgrounds of other key personnel (*id.* 55).

**24.** All of that sets this case apart from those in which persons claiming fraud relied solely upon oral representations as to a project's or developer's background and viability (see, e.g., *North Am. Fin. Group, Ltd. v. S.M.R. Enter., Inc.*, 583 F.Supp. 691, 698 (N.D.Ill.1984)). Requiring investors to investigate is quite a different matter from requiring those investors to *verify* the information presented to them in what appears to be such a thorough presentation.

**25.** Indeed, there is much to be said for the proposition that retention of a knowledgeable law firm would eliminate any obligation of the client to pursue an independent inquiry.

**26.** There is no inconsistency between the "independent investigation" required by *Teamsters Local 282*, 839 F.2d at 371 and this Court's application of inquiry notice standards. *Teamsters Local 282* merely held the parties responsible for failing independently to evaluate the information *in their possession.*

discovery rule tolls the running of the relevant statute of limitations until an injured party knows or reasonably should know of the injury and also knows or reasonably should have known that it was wrongfully caused. That last generic concept speaks of the point at which the injured person has sufficient information about both the injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved (*id.* at 416, 58 Ill.Dec. at 729–30, 430 N.E.2d at 980–81). At that time, the party is obligated to inquire further to determine whether an actionable wrong has been committed (*id.*).

*Knox College, id.* at 416, 58 Ill.Dec. at 730, 430 N.E.2d at 981 says that the triggering point for such inquiry is generally a question of fact. Yet more recent decisions, while echoing the *Knox College* rationale, have noted that a court may properly decide the issue where it becomes apparent from the undisputed facts that only one conclusion might be drawn (see, e.g., *Hermitage*, 202 Ill.Dec. at 468, 637 N.E.2d at 1204; *Santa Claus Indus., Inc. v. First Nat'l Bank*, 216 Ill.App.3d 231, 237, 159 Ill.Dec. 657, 661, 576 N.E.2d 326, 330 (1st Dist.1991)). That calls for a more detailed look at the record here.

Kolson and Weinsteins say that they began to question Vembu's character in October 1989, when Vembu reneged on his promise to "hire" Kolson.[27] Later, in October 1992, Kolson claims to have learned from one of Vembu's former associates that Vembu had never paid hundreds of thousands of dollars to one of the engineering consultants as part of Vembu's equity contribution (AC ¶ 17). Kolson claims to have learned additional relevant facts several months later from Vembu's deposition taken in connection with the Sylvester Whey bankruptcy (*id.*).

In response to this Court's request that they provide specific instances of actual knowledge by Kolson and Weinsteins of

claimed misrepresentations by Vembu, he and Robex filed a supplement to their motion for summary judgment. Nothing set out there is sufficient to erase any question of material fact as to the timing of accrual. Aside from the already-mentioned claims as to the opportunities to review the Memorandum, the supplement points to the fact that Kolson was elected Vice–President and Secretary of Sylvester Whey in 1986, then President and Treasurer in January 1987.[28] Although Vembu and Robex claim that Kolson was privy to enough information so that he might have discovered the claimed misrepresentations with "reasonable diligence," they do not identify any single event or document that should have placed Kolson on such notice before October 1989.

■■■ Indeed, that last claim misconstrues the applicable standard, for Kolson's mere access to additional information did not by itself trigger a duty to investigate. Such a duty arises only when a reasonably prudent person would be put on notice of having been wronged (*Knox College*, 88 Ill.2d at 415–16, 58 Ill.Dec. at 729, 430 N.E.2d at 980). It follows that the mere access to outside information will not bar a claim of fraudulent misrepresentation where that information is not relevant to claimed falsehoods (see *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1516 (10th Cir.1983)). Vembu and Robex have not shown the presence of any specific information to which Kolson had access that would have contradicted (or called for further inquiry into the truthfulness of) Vembu's representations about his level of education, past professional experience, the amount of equity Vembu personally invested in Sylvester Whey or Robex' ability to repay the loans. Nor have they specified any facts to which Kolson had access that would have apprised him of Vembu's intention to dishonor his claimed pledge to "hire" Kolson.[29]

---

**27.** Though it is not entirely clear from the record, it appears that Kolson was granted the title but not the responsibilities that he was seeking (Kolson Dep. 112–15).

**28.** That supplement also cites a Kleinwort Benson memorandum dated April 15, 1987 noting that Vembu had not summarized cash outlays already made on "capital and current expenses"

(D. 12(m) Ex. J at 1). But that indicates only that Vembu had failed to provide such summaries to Kleinwort Benson—scarcely a material inquiry-stimulating delinquency.

**29.** This opinion's finding that summary judgment on the issue of accrual is inappropriate does not speak to the ultimate issue bearing on the claim of promissory fraud—whether Vembu intended

Finally and belatedly, Vembu and Robex have failed to establish facts under which Kolson and Weinsteins should be stripped of reliance on the discovery rule. *Hermitage Corp.*, 202 Ill.Dec. at 468, 637 N.E.2d at 1204 holds that if a plaintiff discovers a cause of action within the limitations period and still has a reasonable time within which to file a lawsuit, the discovery rule will not apply and the plaintiff must file within the period. Here Vembu and Robex claim that Kolson and Weinsteins should have been aware of the claimed fraud as early as August 14, 1986, to which the latter respond that discovery did not occur until July 1993. On that score Vembu and Robex offer no contest, and more importantly they tender no evidence that calls for the conclusion as a matter of law that such discovery *should* have been made earlier. Without such additional factual support, they could not dispatch the fraud claim on time-bar grounds if it were needed to sustain this litigation.

In sum, although it does not make a difference in light of the total Kolson–Weinsteins victory on their other claim, the facts as to the accrual of the fraud claim here cannot be labeled as uncontested. Although Vembu and Robex say that reasonable persons of Kolson–Weinsteins' level of sophistication should have known of the claimed fraud well before 1989, Vembu and Robex point only vaguely to missed opportunities for further research. In turn Kolson and Weinsteins speak of October 1989—when they claim Vembu withdrew his offer to hire Kolson—as the first occasion on which they became suspicious. Thus a genuine issue would have remained as to when they did or reasonably should have become aware of Vembu's claimed fraud.[30] But again as matters have turned out, all of that really proves to be moot—Kolson and Weinsteins have won this case.

*Conclusion*

There is no genuine issue of material fact as to the validity of the $150,000 in Robex guaranties. Nor is there any question that Vembu himself disregarded the distinct incorporation of Robex, so that equity prevents him from shielding himself from liability by asserting Robex' corporate form. In sum, Kolson and Weinsteins are entitled to a judgment jointly and severally against both Robex and Vembu personally for the entire $150,000 plus interest under AC Count II.[31]

As for AC Count I charging fraud, the ruling on Count II has really made it unnecessary to decide the matter (Kolson and Weinsteins have sought no different measure of damages on their alternative claims). Nonetheless, in the interest of completeness this Court has determined that genuine issues of material fact exist as to the precise time at which Kolson and Weinsteins discovered or should have discovered that they had been wronged. Hence the Vembu–Robex motion for summary judgment on the basis of the Illinois statute of limitations for fraud actions would have had to be denied in all events.

to renege on his promise from the very beginning (see *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir.1992)).

**30.** Once more the result would have been the same under Wisconsin law—see *Hansen v. A.H. Robins Co.*, 113 Wis.2d 550, 335 N.W.2d 578, 583 (1983); *Stroh Die Casting Co. v. Monsanto Co.*, 177 Wis.2d 91, 502 N.W.2d 132, 137 (App. 1993).

**31.** As for the proper amount of that judgment, under the terms of all of the promissory notes Sylvester Whey agreed to pay (and Robex therefore guaranteed) 10% per annum on the unpaid principal balance (P. 12(m) Ex. B) from the date of execution until the obligations came due (December 15, 1989 after the extensions) and 13%

per annum afterwards. Under Illinois law governing the notes and guaranties, interest is calculated so as to avoid compounding unless the parties otherwise agree (*Harrington v. Kay*, 136 Ill.App.3d 561, 570, 91 Ill.Dec. 214, 221, 483 N.E.2d 560, 567 (1st Dist.1985)). All of that is uncontroverted—but because no judgment order has yet been entered, no interest calculation can be made at this time. This Court therefore orders counsel for each side to tender proposed calculations in that respect both to opposing counsel and to this Court (by a filing in chambers) on or before November 29, 1994, calculated on the premise that final judgment is to be entered on the following day. This Court will then order the entry of such a judgment.

*SUPPLEMENT TO MEMORANDUM*
*OPINION AND ORDER* [1]

This Court's November 28, 1994 memorandum opinion and order (the "Opinion") (1) determined that Rajan Vembu ("Vembu") and Robex USA, Ltd. ("Robex") were jointly and severally liable to Rob Kolson ("Kolson") and Eric and Irwin Weinstein (collectively "Weinsteins") in the principal sum of $150,000 plus interest and (2) directed the parties to submit interest calculations by November 29, to permit the entry of a final judgment on November 30.[2] Each side's counsel has timely provided such calculations, and this supplement to the Opinion reflects the resolution of their competing positions.

Because the five promissory notes at issue have always been available to both sides (and they formed part of the record on the cross-motions for summary judgment), it is hardly surprising that the parties have not quarreled as to the notes' respective principal amounts and dates of issue, their collective extended date of maturity (December 15, 1989) and their prematurity (10% per annum) and postmaturity (13% per annum) interest rates. Instead, the litigants' interest calculations differ by more than $75,000 solely as a consequence of their dispute as to whether the notes bear only simple interest or interest compounded annually.

Neither side had even mentioned that facet of the interest calculation in their briefing of the summary judgment motions (indeed, the Kolson–Weinsteins GR 12(M) statement did not even include an assertion as to the amount that they claimed to be due (including interest), although their Mem. 23 did spell out the principal and interest figures on a basis that was derived via the compound interest route). Accordingly it was this

Court that addressed the subject for the first time (Opinion 1331 n. 31), by correctly stating the Illinois rule that simple interest would apply in the absence of an agreement for compounding.[3]

Now counsel for Kolson and Weinsteins bring forward two documents that they say evidence just such an agreement:

1. On September 10, 1991 Kolson wrote a letter to Sylvester Whey, stating that he was writing at Vembu's request asking for a schedule of proposed debt reduction. After setting out the principal amounts and dates of the five notes, Kolson said in part:

> The principal amount totals $150,000. The notes accrue interest at a rate of 10% compounded annually until December 15, 1989, and at a rate of 13% thereafter.

Immediately after that Kolson stated the amount of his calculations "which you are welcome to check"—and those calculations plainly reflected a fully compounded figure.

2. Another letter, this one addressed to Kolson and Weinsteins on November 11, 1992, was written by Sylvester Whey's Madison, Wisconsin lawyer Larry Libman of the Axley Brynelson law firm (with copies of the letter shown as having been sent to both Vembu and Sylvester Whey). That letter reflected and enclosed a proposed agreement between Sylvester Whey on the one hand and Kolson and Weinsteins on the other, which acknowledged the existing default in payment of the five notes and set out a proposed arrangement for the future liquidation of that obligation by payment of a percentage of Sylvester Whey's future cash flow. Among the recitals to that agreement was a statement of the then outstanding bal-

---

1. Except for its recapitulation of the shorthand references to the parties litigant, this supplement will not repeat—but will utilize—defined terms in the Opinion.

2. That timetable was not at all as hurried as the dates in the text would suggest. On November 23 this Court's chambers had advised counsel for each side of the decision that this Court had reached as to liability (at that time the lengthy Opinion was in the typing process) and also told counsel of their need to submit the interest calculations. Because of the intervention of the Thanksgiving holiday it was November 28 before

the Opinion became available for signing and distribution.

3. Each note's provision that speaks of an interest rate simply in "per annum" terms is intrinsically ambiguous, for that could reflect either an old-style simple interest calculation or the more modern recognition that the true cost represented by the loss of the use of money requires compounding. What Opinion 36 n. 31 referred to as the Illinois rule is like most default rules in the law—it reflects what the law will presume in the absence of an express agreement between the parties.

ance that clearly reflected far more than a simple interest calculation—indeed, the figure was obviously the product of compounding:

> WHEREAS, as of October 31, 1992, the total outstanding balance, including principal and accrued interest, which is owed to the Lenders by SWPI on the Loan is $290,000.00 (the "Loan Balance"). . . .

Counsel for Vembu and Robex counter that the documents on which Kolson and Weinsteins seek to rely cannot represent any agreement between the parties with regard to interest (Mem. 2). They point out that Kolson's letter is purely unilateral and that the document that had been enclosed with the letter from Sylvester Whey's lawyer was a "proposed settlement agreement [that] is not signed by any party involved in this litigation and must not be considered in determining whether the interest calculation be simple interest or compounded annually" (*id.* 2–3).

There is no dispute as to the authenticity of the two documents—where the parties part company is rather as to legal effect of those documents. As for the first document, Vembu and Robex are entirely correct: It sets out only Kolson–Weinsteins' understanding and intention (Kolson was also acting as the agent for Weinsteins in writing the letter), so it could not by itself constitute the necessary agreement. But as for the second document, Vembu and Robex are just as clearly wrong: It plainly satisfies the need for a showing of Sylvester Whey's agreement that the notes called for compound interest.

Fed.R.Evid. ("Rule") 408 is the well-known embodiment, plus an extension, of the common law rule that sought to encourage the settlement of disputes by rendering settlement offers as such inadmissible to show liability for, or the amount of, a claim. Where the second sentence in the following quotation from Rule 408 goes beyond the common law rule is in also excluding from admissibility statements that are made during negotiations for compromise:[4]

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or

offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Where the Vembu–Robex argument goes astray in its implicit invocation of Rule 408 (although their current memorandum cites no authority in support of their position, they obviously seek to rely on the rule of law that excludes evidence of the types described in the Rule) is that in this instance neither the validity nor the amount of the claim was in dispute (thus the proposed agreement's "WHEREAS" recital that immediately preceded the one quoted earlier in this supplement said "for various reasons, [Sylvester Whey] has been unable to pay the Loan as required under the Loan Documents and is technically in default under the Loan Documents"). Instead the parties' then-active settlement negotiations dealt only with the time and mechanism for *payment* of the undisputed claim. In that respect the last two sentences in the following quotation from 2 Weinstein & Berger ¶ 408[01], at 408–12 to 408–13 (footnotes omitted) might well have been written for this very case (see also the cases cited there):

> The Advisory Committee Note also states that "the effort . . . to induce a creditor to settle an admittedly due amount for a lesser sum" would not further the underlying policy of the rule and is therefore not protected. Yet a careful distinction must be made between a frank disclosure during the course of negotiations—such as "All right, I was negligent. Let's talk about damages" (inadmissible)—and the less frequent situation where both the validity of the claim and the amount of damages are admitted—"Of course, I owe you the money, but unless you're willing to settle for less, you'll have to sue me for it" (admissible). Likewise, an admission of liability made during negotiations concerning the time of payment and involving neither the

---

4. See 2 Jack Weinstein & Margaret Berger, *Weinstein's Evidence* ¶ 408[03], at 408–24 (1994).

**1334**

validity nor amount of the claim is not within the rule's exclusory protection. Hence the earlier-quoted "WHEREAS" recital as to the total outstanding balance, including accrued interest, amounting to $290,-000 comes squarely within the category of statements that are defined as nonhearsay and are rendered admissible by Rule 801(d)(2)(D):

> The statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. . . .

Attorney Libman was unquestionably Sylvester Whey's agent, and his statements were equally unquestionably made in the scope and during the existence of the agency relationship.[5] And the key statement here, the amount of accrued interest, was *not* made in the course of an offer of settlement but was rather a recital of an acknowledged *fact*—and so it represents a classic example of an admission (what at common law used to be termed the "admission against interest" exception to the hearsay rule, but has now been expanded by the Rule 801(d)(2) definition of nonhearsay). This Court *is* then entitled to consider that admission, which binds Vembu and Robex (see n. 5).

In summary, Kolson and Weinsteins have demonstrated the necessary agreement of the parties for the compounding of interest. Because Vembu and Robex have not contested the accuracy of the Kolson–Weinsteins calculations if their legal theory is correct, this Court orders that judgment be entered in favor of Kolson and Weinsteins and against Vembu and Robex jointly and severally in the sum of $150,000 in principal plus $221,437.04 in interest, for a total judgment amount of $371,437.04.

---

5. Robex as guarantor of Sylvester Whey's obligations is subject to liability that is coterminous with Sylvester Whey's. And Vembu's derivative obligation, either through piercing Robex' corporate veil or as that corporation's alter ego, is of course exactly the same. Hence the earlier-quoted argument by the Vembu–Robex lawyer that the 1992 document was not signed by either Vembu or Robex is entirely empty: They stand in the shoes of Sylvester Whey, and that corporation was and is bound by its lawyer's admission. Thus Vembu and Robex are equally bound.